# STATE OF MICHIGAN

# COURT OF APPEALS

JOSEPH WIER,

Plaintiff-Appellee,

v

ALLSTATE INSURANCE COMPANY,

Defendant-Appellant.

UNPUBLISHED
March 13, 2018

No. 334773
Macomb Circuit Court
LC No. 2014-003584-NF

JOSEPH WIER,

Plaintiff-Appellant,

v

ALLSTATE INSURANCE COMPANY,

Defendant-Appellee.

No. 335167
Macomb Circuit Court
LC No. 2014-003584-NF

Before: TALBOT, C.J., and BECKERING and CAMERON, JJ.

PER CURIAM.

This matter arises from an action for first-party, no-fault benefits. In Docket No. 334773, defendant, Allstate Insurance Company, appeals as of right an order of judgment entered pursuant to a jury verdict in favor of plaintiff, Joseph Wier. Allstate raises claims of error concerning the trial court's pretrial rulings regarding summary disposition and the admissibility of expert opinions; trial rulings regarding the admissibility of various insurance claim files; Allstate's motion for a directed verdict concerning attendant care benefits; and Allstate's request to use a modified verdict form. In Docket No. 335167, Wier cross-appeals by right the trial court's order denying his motion for attorney fees pursuant to MCL 500.3148. We affirm in both appeals.

## I. BACKGROUND

On September 9, 1996, then 14-year-old Wier fell from the back of a pickup truck and struck his head on the ground. Emergency room records from St. John Hospital indicate that

-1-

Wier was awake and alert upon his arrival at the emergency room, but somewhat disoriented and uncooperative. Wier was also combative to the point that he was repeatedly administered a calming medication. A CT scan of Wier's head revealed evidence of a non-depressed skull fracture, multiple areas of hemorrhage, and possible mild generalized cerebral edema. He was admitted to the hospital for further monitoring and discharged on September 19, 1996, with a final diagnosis of a closed-head injury.

Allstate has never disputed that Wier sustained a traumatic brain injury (TBI) in the 1996 accident and it paid personal protection insurance (PIP) benefits in connection with that injury. However, Allstate closed the file in 1997 when it appeared that Wier had either stopped receiving accident-related treatment or otherwise stopped submitting claims for benefits.[1] Wier's family remained in limited contact with Allstate through 1999 in connection with his third-party bodily injury claim. Allstate's claim file reflects some attempt to reopen the claim between 2000 and 2001, but contact ceased thereafter until 2012.

In the fall of 2012, Wier overdosed on Ambien and was admitted to a psychiatric facility. After he was released, Wier retained the services of a nurse case manager and, with her assistance, sought treatment to address his behavioral and emotional instability that purportedly related back to the 1996 accident. He began treating with several providers including physiatrist Todd Best, M.D.; psychologist Ray Kamoo, Ph.D.; and psychiatrist Eugene Rubin, M.D. Wier was also referred to counseling, vocational rehabilitation, and recreational therapy.

Wier's claim with Allstate was reopened and Allstate initially paid allowable expenses for his treatment and care. Later, Wier submitted to independent medical examinations (IME) with neuropsychologist Robin Hanks, Ph.D., and psychiatrist Jeffrey Kezlarian, M.D., both of whom opined that Wier was not suffering from any residual effects of the TBI he sustained in the 1996 accident. Instead, Dr. Hanks believed that Wier's condition was caused by an underlying psychiatric condition involving paranoid ideation, suspiciousness, and antisocial personality traits, and Dr. Kezlarian attributed Wier's difficulties to bipolar disorder that emerged after the 1996 accident, which had been previously diagnosed by some of Wier's mental health providers. On the basis of these opinions, Allstate ceased payment of Wier's claimed benefits.

## II. EXPERT OPINIONS

On appeal, Allstate first argues that the expert opinions offered by Wier's treating physicians were inadmissible. Thus, according to Allstate, the trial court erred by denying summary disposition and by declining to limit the physicians' testimony or hold a *Daubert*[2] hearing. We disagree.

---

[1] Allstate's payment records also reflect payment of two additional claims for allowable expenses in 1999 and three additional payments in 2001.

[2] *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

-2-

This Court reviews a trial court's rulings on summary disposition motions de novo.[3] "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law."[4] A trial court deciding a motion for summary disposition under this rule must consider the "pleadings, affidavits, depositions, admissions, and other admissible evidence submitted by the parties in the light most favorable to the nonmoving party."[5] When the nonmoving party has the ultimate burden of proof at trial, the moving party can satisfy its burden of production under MCR 2.116(C)(10) by " 'submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim,' *or* by 'demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.' "[6] If the nonmoving party fails to produce evidence sufficient to demonstrate an essential element of its claim, the moving party is entitled to summary disposition.[7]

This Court reviews a trial court's decision regarding the admissibility of evidence, including opinion testimony offered by a proposed expert, for an abuse of discretion.[8] The trial court's decision whether to conduct an evidentiary hearing is, likewise, reviewed for an abuse of discretion.[9] "An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes."[10] "A court necessarily abuses its discretion when it admits evidence that is inadmissible as a matter of law."[11]

Under the no-fault act, MCL 500.3101 *et seq.*, an insurer is obligated to pay certain benefits if those benefits are causally connected to an "accidental bodily injury arising out of an automobile accident."[12] Those benefits include "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for

---

[3] *Robins v Garg (On Remand)*, 276 Mich App 351, 361; 741 NW2d 49 (2007).

[4] *Dancey v Travelers Prop Cas Co*, 288 Mich App 1, 7; 792 NW2d 372 (2010) (quotation marks and citation omitted).

[5] *Robins (On Remand)*, 276 Mich App at 361.

[6] *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344 (2016), quoting *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996) (alterations in original).

[7] *Lowrey*, 500 Mich at 9.

[8] *Craig v Oakwood Hospital*, 471 Mich 67, 76; 684 NW2d 296 (2004); *Lenawee Co v Wagley*, 301 Mich App 134, 161; 836 NW2d 193 (2013).

[9] *Lenawee Co*, 301 Mich at 162.

[10] *Id*.

[11] *Craig*, 471 Mich at 76 (quotation marks and citation omitted).

[12] *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 531; 697 NW2d 895 (2005). The bodily injury must also be caused by the insured's use of a motor vehicle. *Id*. This aspect of causation is not at issue in this case.

an injured person's care, recovery, or rehabilitation."[13]  Allstate does not dispute that Wier suffered a TBI as a result of the 1996 accident.  Instead, it argues that it was entitled to summary disposition or, minimally, an evidentiary hearing, because Wier's only evidence demonstrating that his present condition arose from the 1996 accident consisted of the opinions of his treating physicians.  According to Allstate, the physicians' proposed expert opinions were unreliable, and therefore inadmissible under MRE 702 and MCL 600.2955, because they were not supported by a sufficient factual basis.  Allstate also contends that summary disposition should have been granted because a number of intervening events terminated its liability for continued PIP benefits in connection with the 1996 TBI.

Allstate moved for summary disposition in the trial court, arguing that Wier could not establish that his then-existing condition (his behavioral and emotional instability) was causally related to the 1996 accident because his treating physicians did not have a reliable factual foundation for their opinions.  Wier's physicians relied primarily upon the history related to them by Wier and his mother, which Allstate averred was inaccurate, incomplete, and contradicted by various medical, academic, and employment records.  Allstate attached documents to its motion concerning matters that arose after the 1996 accident—namely, a number of subsequent injuries and accidents, difficulty with substance abuse, and psychiatric diagnoses—which were unknown to Wier's physicians at the time they treated Wier and determined that his condition arose from his accident-related TBI.  Allstate also produced some evidence indicating that Wier had developmental delays that affected his education as early as 1988.  According to Allstate, because Drs. Best, Rubin, and Kamoo did not know about these facts before concluding that Wier's behavioral and emotional difficulties were causally linked to the 1996 accident, they could not offer admissible expert opinions on the issue of causation.  Allstate further asserted that each of the subsequent injuries and psychiatric conditions amounted to intervening and superseding events that terminated its continued liability for payment of PIP benefits in connection with Wier's 1996 injury.  The trial court denied Allstate's motion, reasoning that its challenge to Wier's ability to satisfy the causation element was, in essence, a challenge to the admissibility of Wier's proffered expert testimony.  As such, the court concluded that the more appropriate avenue for Allstate to raise its arguments was through a *Daubert*-type hearing and denied summary disposition based on the existence of a question of fact.

Following this ruling, Allstate filed a motion to limit the testimony of Drs. Best, Rubin, and Kamoo, or alternatively, for a *Daubert* hearing.  In support of its motion, Allstate produced transcripts from the physicians' discovery depositions, in which each physician acknowledged that he only reviewed the limited records that were made available to him[14] and made little or no effort to obtain additional medical, academic, or employment records to corroborate or expand upon the history provided by Wier and his mother, which was generally accepted at face value.  The trial court denied the motion, concluding that Allstate's challenge went to the weight, rather than admissibility, of the physicians' opinions.

_____

[13] MCL 500.3107(1)(a).

[14] These records consisted of a report from a 1999 neuropsychological evaluation and the 2012 psychiatric facility discharge report.

The admissibility of expert testimony is governed by MRE 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Pursuant to this rule, the trial court must function as a gatekeeper in making decisions regarding the admissibility of scientific evidence and ensure that expert testimony meets that rule's standard of reliability.[15] MCL 600.2955(1) sets forth several factors that a trial court must consider in examining the reliability of an opinion proffered by a qualified expert in an action sounding in personal injury.[16] As observed in *Chapin v A & L Parts, Inc*, "the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes."[17] Instead, the trial court must strive to ensure that the proposed expert opinion is "rationally derived from a sound foundation."[18] Additionally, once the opponent of proposed expert testimony challenges its admissibility, the trial court must act as gatekeeper and evaluate the admissibility of the opinion under MRE 702.[19] The proponent of the evidence bears the burden of establishing its admissibility.[20]

In the instant matter, the only basis for Allstate's challenge to the admissibility of the expert opinions is the alleged insufficiency of the facts each expert relied upon. Importantly, Allstate does not seem to argue that if Wier's history, as understood by his doctors, had been complete and accurate, that it would still fail to satisfy the requirements of MRE 702. Instead, Allstate has continuously averred that an expert opinion is only admissible if based on facts that have been independently verified. The glaring problem with this notion is perfectly illustrated in this case: when an expert opinion requires interpretation or application of facts that are disputed in the case and potentially dispositive of the central issue at hand, how can the proponent of the evidence demonstrate a sufficient factual basis for the opinion without submitting those disputed matters to the trier of fact? The inherent problems arising from this type of circular logic can be avoided by recognizing that the heart of Allstate's argument in this case rests not on the abstract

---

[15] *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004), citing *Daubert*, 509 US 579.

[16] *Elher v Misra*, 499 Mich 11, 23-24; 878 NW2d 790 (2016).

[17] *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007).

[18] *Id*.

[19] *Craig*, 471 Mich at 82.

[20] *Gilbert*, 470 Mich at 781.

requirement that an opinion be "based on sufficient facts or data," but rather on Allstate's assertion that Wier's self-reported history was inaccurate, incomplete, and incredible.

Although the context in which this issue arose caused considerable confusion below, its resolution does not require a novel application of our existing jurisprudence on the admissibility of expert opinions. This Court has previously explained that an expert's opinion is objectionable when "based on assumptions that did not accord with the established facts."[21] In *Thornhill v Detroit*, the plaintiff's proposed expert suggested that the decedent likely died after aspirating vomitus based on his belief that the decedent began frothing at the mouth after an emergency medical team arrived, while the only eyewitness clearly indicated that the frothing began before the team's arrival.[22] This Court affirmed the trial court's exclusion of the proposed opinion because it lacked a sufficient factual basis.[23]

Similarly, in *Badalamenti v William Beaumont Hospital-Troy*, the plaintiff alleged that the defendant negligently failed to diagnose and properly treat the plaintiff for cardiogenic shock, while the defendant denied that the plaintiff suffered from that condition.[24] The plaintiff's expert testified about definitive hemodynamic measurements that must be present to diagnose cardiogenic shock, including "a wedge pressure of greater than 18 [and] a cardiac index of less than 1.8 . . . ." Yet, established facts demonstrated that the plaintiff's wedge pressure and cardiac index were within normal range.[25] Moreover, the experts relied upon by both parties agreed that "the major component of cardiogenic shock consists of *significant* damage to the heart's pumping action," and the doctor who performed an echocardiogram on the plaintiff found that the plaintiff's left ventricular function was "essentially normal and preserved . . . ."[26] Nonetheless, the plaintiff's expert opined that the plaintiff suffered from cardiogenic shock, based on his skepticism of the echocardiogram results.[27] Moreover, the expert acknowledged that if the echocardiogram showed relatively normal wall motion, "he would be 'very happy to agree' that 'this was not cardiogenic shock in any shape, way, or form' . . . ."[28] Because the expert's only basis for his proposed opinion was his subjective skepticism and disparagement of

---

[21] *Green v Jerome-Duncan Ford, Inc*, 195 Mich App 493, 499; 491 NW2d 243 (1992), citing *Thornhill v Detroit*, 142 Mich App 656, 658; 369 NW2d 871 (1985).

[22] *Thornhill*, 142 Mich App at 658-661.

[23] *Id*. at 661.

[24] *Badalamenti v William Beaumont Hospital-Troy*, 237 Mich App 278, 281-282; 602 NW2d 854 (1999).

[25] *Id*. at 286-287.

[26] *Id*. at 287 (quotation marks omitted).

[27] *Id*.

[28] *Id*. at 288.

the echocardiogram findings, this Court concluded that there was a legally insufficient factual basis for the expert's opinion and vacated the trial court's judgment in favor of the plaintiff.[29]

By contrast, in *Robins v Garg (On Remand)*, this Court found that a proposed expert opinion was admissible because it did not contradict established facts.[30] In that case, a medical examiner testified that he believed the decedent's cause of death was asthma, with myocardial infarction as a contributing cause. The plaintiff's expert, on the other hand, opined that myocardial infarction was the primary cause of death.[31] This Court distinguished the circumstances at issue in *Robins (On Remand)* from those in *Badalamenti* by explaining that the expert's opinion arose from his disagreement with the medical examiner's personal interpretation of the findings, rather than the actual objective findings of the autopsy. Thus, the opinion was not derived from assumptions that were contradicted by *established* facts.[32]

Here, Allstate contends that the treating physicians' failure to procure pertinent records left them unable to account for Wier's complete history of developmental delays, injuries, and mental health disorders and therefore unable to render a reliable expert opinion. Having conducted a careful review of the evidence submitted by Allstate in support of its dispositive motion, we believe that there was a sufficient factual basis for each of the expert's proposed opinions for Wier to survive summary disposition and to support the trial court's decision to deny an evidentiary hearing concerning that issue. The facts presented by Allstate in support of its dispositive motion can generally be placed into three categories: information that was believed to be true, but allegedly inaccurate; information that was incomplete; and information that was unknown.

The first of these categories consists primarily of Wier's academic performance and behavior in school before and after the accident. Each physician placed significance on Wier's assertion that his academic performance and behavior in school declined after he sustained the TBI, despite the fact that he was in a gifted program before the accident. Allstate produced progress reports spanning between 1992 and 2000, as well as evidence demonstrating that Wier was placed in a readiness program in lieu of first grade due to developmental delays. Viewing this evidence in the light most favorable to Wier, we disagree that it necessarily contradicted Wier's self-reported academic history. Wier's academic records identify the name of the courses he was enrolled in, the grades he earned, his attendance record, and occasional comments, without any way of discerning whether the classes were designated as advanced, special education, or mainstream. Wier's grades declined somewhat in the year preceding the accident—in addition to B's, C's, and a single A, his lowest final mark was a D—and his "citizenship" scores ranged from good to acceptable. Before the accident, Wier's teachers regularly reported that he needed to improve his work quality and refrain from talking at

---

[29] *Id*. at 288-289.

[30] *Robins (On Remand)*, 276 Mich App at 362-363.

[31] *Id*.

[32] *Id*. at 363.

inappropriate times. On the other hand, his fifth grade teacher specifically commented that Wier needed to use his "extensive academic talent." While Allstate contends that these records reveal that Wier's academic performance declined before the accident, this evidence could also be construed as indicating that Wier's performance was the result of poor effort, rather than low intellect or an inability to concentrate. Moreover, regardless of his midlevel performance in the years preceding the accident, he did not begin to fail courses until after the 1996 accident. The reports produced from Wier's high school years only reflected his performance in the first month of the tenth and twelfth grades at which point it does not appear that final grades were available. On the whole, this evidence creates a question of fact as to whether Wier participated in a gifted program and whether his academic decline is attributable to his TBI.

With respect to the second category—incomplete information—Wier's physicians were aware of his past substance abuse and mental health diagnoses but did not know the extent or details of that aspect of his history. However, the physicians generally recognized and endorsed the fact that Wier presented symptoms that were consistent with bipolar disorder; namely, periods of depression, mania, irritability, impulsivity, and disturbed wake and sleep cycles. Nonetheless, Dr. Rubin rejected that diagnosis because Wier's symptoms did not always manifest during mood episodes and because Wier had other symptoms that were more indicative of a TBI. Dr. Kamoo also opined that those symptoms were consistent with several conditions and stated that he would not jump to the conclusion that Wier suffered from bipolar disorder. Additionally, he placed more emphasis on the results of the empirically based neurological testing. Thus, it seems unlikely that further review of Wier's mental health records would have impacted their opinions regarding Wier's alleged bipolar disorder because, like in *Robins (On Remand)*,[33] the experts' disagreement arose from the diagnostic conclusions reached by Wier's former mental health treaters, rather than the facts that supported the conclusions. Similarly, Drs. Best, Rubin, and Kamoo did not contest that Wier struggled with substance abuse in the past and that some of his symptoms were consistent with substance abuse. Despite this agreement, they still opined that Wier's behavioral and emotional instability was the product of his 1996 accident.

The last general category of information presented by Allstate in support of its dispositive motion involved matters that were unknown to Drs. Best, Rubin, and Kamoo, primarily other injuries and accidents that occurred between 1996 and 2012.[34] It is evident that Wier's physicians lacked a complete understanding of his history in this regard, but it does not necessarily follow that the factual basis for their opinions was insufficient. Wier clearly

---

[33] *Robins (On Remand)*, 276 Mich App at 362-363.

[34] Wier was involved in three or four accidents after 1996. The hospital records relating to Wier's 1999 accident note a mild lump on Wier's left parietal region and indicate that Wier reported having hit his head in the collision. Wier fractured his right fibula in 2001. In 2004, he was involved in a jail fight and the emergency room assessment noted facial and lip abrasions, but a "CT of the brain [was] negative," and no treatment plan was required for those injuries. Wier also indicated during his deposition that he was assaulted by two drug dealers sometime between 2005 and 2006, but described the assaults as "[n]othing major."

sustained several injuries after the 1996 accident, but the majority of those injuries involved his lower limbs. With the exception of a motor vehicle accident that occurred in 1999 and resulted in a "mild lump" on the left parietal region of Wier's head, the remaining head and facial injuries noted in the records were superficial and did not require medical intervention. And while it is not difficult to imagine that such an injury could impact the physicians' opinions in this case, the absence of such an injury was not essential to the physicians' opinions, as was the case in *Thornhill*[35] and *Badalamenti*.[36] Moreover, an expert witness need not rule out all alternative causes, as long as there is an evidentiary basis for his or her opinion.[37]

We acknowledge that, as the proponent of the challenged expert testimony, Wier bore the burden of establishing its admissibility.[38] But recognition that Allstate's evidence did not demonstrate that Wier's experts relied on assumptions that were contrary to established fact is highly relevant to whether Wier sustained his burden under MRE 702. The physicians' respective qualifications as experts were not challenged below and they explained their diagnostic approaches during discovery depositions. Dr. Best testified that a TBI is diagnosed by reviewing a patient's history, physical presentation, and diagnostic testing. He described a wide array of symptoms that were indicative of a TBI:

> I mean, you have psychological problems to begin with. People suffer from anxiety, depression, irritability, change in personality, mood irregularity. You have cognitive problems, attention fatigue, mental fatigue, that is, memory, mathematical skills, you know, the entire gamut of cognitive functioning can be affected. You have behavioral problems, impulsivity. For example, impulsivity, energy, motivation problems. You can have somatic symptoms, for example, headaches, dizziness, balance problems. You can have sleep problems, can't get sleep, can't stay asleep. Those are just a sampling of many symptoms.

Wier reported suffering from the majority of these symptoms in 2012.

Dr. Best readily acknowledged that he only reviewed two earlier medical records, one of which was a 1999 report from Michael McMillan, Ph.D., the pediatric psychologist who performed Wier's neuropsychological evaluations in 1996 and 1999. Having reviewed this report, which supported much of the history reported by Wier and his mother, Dr. Best had a historical foundation for his diagnosis. In terms of Wier's presentation when Dr. Best began treating him, Wier complained of many of the same symptoms. Dr. Best also referred Wier for a repeat neuropsychological examination with Dr. Kamoo, the results of which supported his conclusion that Wier's symptoms arose from the 1996 TBI.

---

[35] *Thornhill*, 142 Mich App at 658-661.

[36] *Badalamenti*, 237 Mich App at 286-289.

[37] *Green*, 195 Mich App at 498.

[38] *Gilbert*, 470 Mich at 781.

Dr. Rubin testified that determining the cause of a medical condition requires consideration of the patient's history, examination, and data available from other sources. However, he did not believe it was always necessary to obtain a patient's prior medical records. When asked if he relies on his patient to be an accurate historian, Dr. Rubin qualified that his own experience and collateral information also factored into his understanding of the patient's history. Continuing to see the patient over time was important too. Dr. Rubin had also reviewed Dr. McMillan's 1999 report, which supported his understanding of Wier's history. Dr. Rubin explained that the TBI was the most likely cause of Wier's emotional and behavioral challenges in light of the presentation of those symptoms after the accident. He also noted that "it's not routine psychiatric practice to obtain records of everything that's happened to somebody." Dr. Kamoo was, likewise, armed with the information contained in Dr. McMillan's report when he determined that Wier continued to suffer from the 1996 TBI. More importantly, he placed the most reliance on empirically based testing, and the results of the testing he conducted in 2013 were fairly consistent with Dr. McMillan's results from 1999.

Although Wier's physicians did not obtain any additional records to corroborate Wier's self-reported history, it was not an abuse of discretion to conclude that the information they relied upon, including their continued observations of Wier after they began treating him, provided a sufficient factual basis for their opinions. Importantly, MRE 702 requires that an expert opinion be based on *sufficient* facts—not all-encompassing or unassailable facts. Similarly, MCL 600.2955 requires that the trial court examine the basis for an expert opinion and consider whether the basis is "reliable" and whether other experts in the field would rely on the same basis to reach the opinion being offered.[39] To be clear, we emphasize that the above does not discount or undermine the importance of the factual basis for an expert opinion. If, for instance, Wier's medical records had later shown some objective measurement that disproved his assertion that he sustained a TBI in 1996, an expert opinion premised on the occurrence of that injury would undoubtedly lack sufficient reliability.[40] Additionally, reliance on disputed or incomplete facts leaves the credibility of the expert's opinion open to attack, as occurred in the case at hand. But where the admissibility challenge arises from reliance on disputed facts of the case, as opposed to scientific or technical facts, we do not believe that the trial court's determination that the expert opinions were admissible fell outside the range of principled outcomes.

Furthermore, because the trial court did not abuse its discretion with regard to the admissibility of the expert opinions, it properly denied Allstate's motion for summary disposition because Allstate did not satisfy its burden under MCR 2.116(C)(10). When a party challenges the factual sufficiency of the opposing party's claim under subrule (C)(10), it must either present affirmative evidence negating an essential element of the opposing party's claim or demonstrate that the opposing party's evidence is insufficient to establish an essential element.[41] To the

[39] MCL 600.2955(1)(f).

[40] See, e.g., *Badalamenti*, 237 Mich App at 287-289.

[41] *Lowrey*, 500 Mich at 7.

extent that Allstate offered evidence of Wier's later injuries and psychiatric diagnoses to demonstrate that his recent treatment was attributable to one of those events, rather than the 1996 accident—thereby negating the causation element of Wier's claim—Allstate's evidence was insufficient to satisfy that purpose. Allstate did not offer any expert opinion to that effect or other evidence affirmatively linking Wier's then-existing condition to any of the allegedly intervening events.[42] Rather, it merely pointed to those events as possible alternative explanations for Wier's condition. And to the extent that Allstate tried to satisfy its burden under MCR 2.116(C)(10) by challenging the admissibility of Wier's causation evidence, the court did not abuse its discretion by determining that the expert opinions were admissible.

### III.  CLAIM FILES

Next, Allstate argues that the trial court erred with respect to its evidentiary rulings concerning several claim files. We disagree.

A trial court's evidentiary rulings are reviewed for an abuse of discretion.[43] "An abuse of discretion occurs when a circuit court chooses a result that falls outside the range of reasonable and principled outcomes."[44] "[A]ny error in the admission or exclusion of evidence will not warrant appellate relief 'unless refusal to take this action appears . . . inconsistent with substantial justice,' or affects 'a substantial right of the [opposing] party.' "[45]

The parties referred to or admitted three Allstate claim files at trial: (1) a printed version of the current, electronic PIP file (the current PIP file); (2) the older, paper PIP file containing documents from Wier's initial claim for benefits in 1996, which was archived at the time Allstate reopened the claim in 2012 (the paper PIP file); and (3) a separate file containing records relevant to Wier's bodily injury claim arising from the 1996 accident (the BI claim file). The current PIP file was admitted as Plaintiff's Exhibit 10 and the paper PIP file was admitted as Defendant's Exhibit EE. However, when Allstate began to question Wier's mother regarding the settlement of Wier's bodily injury claim in 1999, the trial court sustained Wier's objection to the admission of the BI claim file on the basis of relevancy. Later, the court clarified that the BI claim file was excluded from evidence, with the exception of any medical records that were absent from the other files, as well as log notes and letters that were referenced during the testimony of Allstate's claim representative, Toni Bradford. Allstate argues that the trial court erred by excluding the balance of the BI claim file from evidence.

---

[42] Given the absence of any evidence causally linking these events to Wier's condition at the time the trial court ruled on Allstate's dispositive motion, Allstate's contention that these intervening events terminated its liability for PIP benefits does not require or warrant more detailed consideration.

[43] *Craig*, 471 Mich at 76.

[44] *Lenawee Co*, 301 Mich at 162.

[45] *Craig*, 471 Mich at 76 (citations omitted) (second and third alterations in original).

As a general rule, relevant evidence is admissible.[46] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[47] However, regardless of its relevance, evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[48]

As it did in the trial court, Allstate maintains that the BI claim file was relevant, and therefore admissible, because it reflected the absence of ongoing complaints concerning Wier's TBI. Defense counsel explained to the trial court:

> I wasn't going to ask her [Wier's mother] how much, I wasn't getting into settlement discussions, I just wanted to ask her if she told the guardian ad litem, I was just going to say the attorney or the judge, that [Wier] was having these problems that she's telling us about today. Because, your Honor, there's no record anywhere of these problems ongoing.

The trial court disagreed, stating that evidence of Wier's third-party claim was irrelevant and could be misleading to the jury.

To the extent that the trial court excluded the BI claim file on the basis of relevancy under MRE 402, it erred by doing so. The primary question presented to the jury was whether the recent expenses for which Wier sought payment arose from the injuries he sustained in the 1996 accident. Allstate's theory of defense was that the expenses Wier incurred in 2012 and beyond were not attributable to the TBI he sustained in 1996, which had healed well before his PIP claim was reopened. Proposed evidence demonstrating that Wier no longer complained of ongoing injuries by 1999, or else affirmatively disclaimed continuing problems, was relevant because it had a tendency to make the credibility of Allstate's defense more probable than it would otherwise be.

Nonetheless, this error does not require reversal because it appears that the trial court also relied on MRE 403 as a basis for excluding the BI claim file from evidence. Although defense counsel asserted that she did not intend to disclose the amount of Wier's third-party settlement, any reference to discussions placed on the record in support of the settlement would implicitly convey that Wier obtained another award from Allstate arising from the 1996 accident. The BI claim file was properly excluded under MRE 403, as the probative value of the settlement discussions contained therein was slight in comparison to the substantial risk of unfair prejudice arising from evidence that Wier received another monetary award in connection with the accident. As the trial court observed, delving too deeply into matters concerning the third-party

---

[46] MRE 402.

[47] MRE 401.

[48] MRE 403.

claim also risked causing jury confusion regarding the distinction between that claim and the first-party benefits at issue in the instant matter.

Furthermore, even if the BI claim file had been improperly excluded, it would not warrant appellate relief because the majority of the factual matters Allstate sought to introduce were still placed before the jury despite the exclusion of the BI file. Wier's failure to present a claim for benefits for over a decade was undisputed and apparent from the records contained within the current PIP file. With respect to Wier's third-party settlement, his sister, Julia Reinhart, testified that she served as Wier's conservator and agreed that she did not advise the court or counsel that Wier continued to have problems associated with his TBI. Although this line of questioning drew objection from Wier's attorney and the trial court instructed defense counsel to "move on," Reinhart's testimony was not stricken from the record. Defense counsel also questioned Wier about a deposition he gave in 2000. Wier agreed that when he was asked how he had progressed with the 1996 TBI, he answered, "I have no problems."

Allstate complains that exclusion of the BI claim file was especially prejudicial in this case because Wier was permitted to introduce log notes and medical records from that file. We disagree. As a preliminary matter, despite the fact that many of the log notes referred to at trial were authored by Allstate's bodily injury adjuster, those notes were incorporated in the current PIP file produced to Wier and introduced at trial as Plaintiff's Exhibit 10, the admissibility of which is not at issue on appeal. The mere fact that Allstate produced log notes from its bodily injury adjuster in the electronic version of the current PIP file does not render other prejudicial and misleading documents contained in the BI claim file admissible. With respect to Wier's use of medical records from the BI claim file, the trial court ruled that all medical records that had not been previously admitted could be introduced. The trial court did not err in this regard, as Wier's medical records were highly relevant to the matters at issue in the trial and did not pose the risk of unfair prejudice or confusion that justifies exclusion of other documents contained in the BI claim file. Moreover, defense counsel only discovered four pages of medical records from Wier's pediatrician that had not already been introduced by way of other exhibits, and the record is unclear as to whether Wier actually relied on those limited pages at trial. Simply put, Allstate's insistence that Wier was unfairly allowed to use select portions of the BI claim file mischaracterizes the trial court's treatment of the pertinent documents. The trial court did not selectively admit some portions of the BI claim file while excluding others; instead, it admitted only those portions of the file that consisted of highly relevant medical records or were otherwise contained in other, previously admitted exhibits.[49]

Allstate also takes issue with the trial court's exclusion of its proposed Exhibit Y, a 2007 claim file from Progressive, and proposed Exhibit Z, a 1999 claim file from AAA. Allstate

---

[49] Contrary to Allstate's assertion in its statement of facts, the BI claim file was not admitted into evidence during the parties' examination of Bradford. Wier's attorney introduced the current PIP file, which contained log notes from the bodily injury adjuster. Defense counsel introduced the paper PIP file and Defendant's Exhibit B, which she identified as "redacted log notes." Defense counsel later referred to the BI claim file as proposed Exhibit R.

argues that the trial court erred by excluding these files because the AAA file contained evidence that Wier sustained a subsequent head injury in 1999 and both files impeached testimony indicating that Wier and his mother did not understand how to file a claim. We disagree.

With respect to the AAA file, the trial court implicitly overruled Wier's objection to its admission by stating that evidence of a subsequent head injury was relevant in terms of the effect it might have had on Wier's earlier TBI. Thus, to the extent that Allstate's proposed exhibit reflected a 1999 accident in which Wier sustained a head injury, it appears that the trial court did *not* exclude the proposed exhibit. Nevertheless, Allstate did not move for admission of its proposed Exhibit Z when questioning Wier about the 1999 accident and injury or at any time thereafter. Having reviewed the proposed exhibit submitted by Allstate for this Court's review, the explanation for this anomaly seems readily apparent: whether due to an inadvertent mistake or otherwise, Allstate's proposed Exhibit Z is not a 1999 claim file evidencing a subsequent head injury. Instead, the six-page document appears to contain log notes from a claim Wier filed in connection with a single-vehicle accident that occurred on April 20, 2004. The claim notes indicate that Wier reported that the accident aggravated arthritis in his back, but makes no reference to a head injury. Accordingly, even if we construed the trial court's ruling as excluding Allstate's use of the proposed exhibit for any purpose, which we do not, it would not amount to an abuse of discretion because the proposed exhibit did not, in fact, demonstrate that Wier suffered a subsequent head injury.

Allstate also argues that it should have been permitted to use the Progressive and Allstate claim files at trial for impeachment purposes. Although evidence concerning a witness's credibility is generally relevant,[50] "[i]t is a well-settled rule that a witness may not be impeached by contradiction on matters which are purely collateral."[51] Further, MRE 608(b) provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence." Here, Allstate sought to use these claim files to impeach Wier's assertion that he did not know how to file a PIP claim, as well as similar statements made by his mother. Whether Wier or his mother knew how to file a claim for benefits was not relevant to any matter apart from their credibility, as the reason for the gap in Wier's claims was not of consequence to the determination of the action. Accordingly, the trial court did not abuse its discretion by precluding Allstate's use of those files for purposes of impeachment on a collateral matter.

## IV. ATTENDANT CARE

Next, Allstate argues that the trial court erred by denying its motion for a directed verdict with respect to attendant care benefits. We disagree.

---

[50] *In re Dearmon*, 303 Mich App 684, 696; 847 NW2d 514 (2014).

[51] *Legalo v Allied Corp (On Remand)*, 233 Mich App 514, 518; 592 NW2d 786 (1999) (quotation marks and citation omitted).

"This Court reviews de novo the trial court's decision[] on a motion for a directed verdict . . . ."[52] In doing so, this Court considers the evidence and reasonable inferences arising therefrom in the light most favorable to the nonmoving party.[53] The ultimate question is whether the nonmoving party's evidence failed to establish the claim as a matter of law.[54]

A plaintiff who seeks reimbursement for attendant care as an allowable expense must "prove by a preponderance of the evidence not only the amount and nature of the services rendered, but also the caregiver's expectation of compensation or reimbursement for providing the attendant care."[55] Allstate argues that it was entitled to a directed verdict with respect to attendant care benefits because Wier's evidence at trial was too speculative to meet these requirements. We disagree.

The requirement that a family member who provides attendant care must do so with the expectation of payment arises from the statutory language of MCL 500.3107(1)(a) requiring payment of expenses that were "incurred."[56] In *Douglas v Allstate Ins Co*, our Supreme Court reasoned that in the absence of "some degree of liability" arising from the insured's receipt of goods or services, the amount sought was not actually incurred.[57] However, while proof that the expense has been incurred must be presented, the form of that proof is not limited.[58] As the *Douglas* Court observed,

> This evidentiary requirement is most easily satisfied when an insured or a caregiver submits itemized statements, bills, contracts, or logs listing the nature of services provided with sufficient detail for the insurer to determine whether they are compensable. Indeed, the best way of proving that a caregiver actually "expected compensation for [her] services" at the time the services were rendered is for the caregiver to document the incurred charges contemporaneously with providing them—whether in a formal bill or in another memorialized statement that logs with specificity the nature and amount of services rendered—and submit that documentation to the insurer within a reasonable amount of time after the services were rendered.[59]

---

[52] *Kallabat v State Farm Mut Auto Ins Co*, 256 Mich App 146, 150; 662 NW2d 97 (2003).

[53] *Id*.

[54] *Id*.

[55] *Douglas v Allstate Ins Co*, 492 Mich 241, 247-248; 821 NW2d 472 (2012).

[56] *Id*. at 267-268.

[57] *Id*.

[58] *Id*. at 268 ("The fact that charges have been incurred can be shown by 'various means' . . . .").

[59] *Id*. at 269-270 (footnotes and citations omitted) (alteration in original).

But while such documentation may be the easiest or preferable form of proof, "no statutory provision *requires* that this method be used to establish entitlement to allowable expenses . . . ."[60] Indeed, the *Douglas* Court explicitly recognized that "a caregiver's testimony can allow a fact-finder to conclude that expenses have been incurred[.]"[61]

Here, Wier sought attendant care benefits for approximately 16 hours a day, at a rate of $15 an hour. Wier initially submitted the disputed claim for attendant care by providing Allstate with a series of affidavits signed by Wier's mother, father, and brother, indicating that attendant care services "including, but not limited to, assistance with medications, administering and maintaining medical equipment, coordinating medical appointments and transportation, and supervising," were provided every day between September 14, 2013, and August 31, 2014.[62] According to these affidavits, these services were provided for 16 hours most days, with limited daily entries reflecting reduced hours. Brenda testified that these affidavits were prepared by Wier's former attorney and signed all at once. In other words, the affidavits were not the type of contemporaneous documentation described in *Douglas*. But, as noted in that case, the absence of such documentation is not fatal to Wier's claim.

Of the family members who signed the attendant care affidavits, only Wier's mother, Brenda, testified at trial. Brenda agreed that the family helped with Wier's care in the past, but clarified that she has been the person primarily responsible for supervising Wier all along and that she has not received any significant help since Wier's brother began working, although she did not specify when that occurred. Brenda testified that she organizes Wier's medications and ensures that he takes them. She also assists with his person hygiene, as he would not shower if she did not make him. However, the most significant aspect of her attendant care services was supervision. Brenda explained that, left unsupervised, Wier could be a danger to himself and to others. Because of his instability, she was responsible for "his daily everything." "I watch him constantly. I'm making sure he's not telling somebody off or hurting somebody or getting out of line. I live my life around my son." Brenda said that, even at night, she sleeps "with one eye open, one ear to the wall." Wier offered similar testimony regarding Brenda's assistance and supervision.

With respect to the amount of services provided, Brenda agreed that she did not document the services apart from the affidavits prepared by Wier's former attorney. She acknowledged that she "lost count" of how much time she spent supervising Wier, but said that she supervised him 24 hours a day since Wier stopped going to vocational rehabilitation. Brenda and Wier both testified that he promised to pay her for her services if his claim was successful. Neither testified to a specific, agreed-upon hourly rate, but Bradford indicated that family-provided attendant care is generally paid at a rate of $8 to $18 per hour, and that Allstate paid Brenda at a rate of $30 per day and $20 per half day in 1996.

---

[60] *Id.* at 270.

[61] *Id.*

[62] Contrary to Allstate's assertion that these affidavits were not admitted at trial, they are contained within Allstate's current PIP file, which was admitted as Plaintiff's Exhibit 10.

In light of the foregoing evidence, we disagree that Wier's attendant care claim was too speculative to submit to the jury. Although it is true that a jury should not be permitted to speculate concerning the amount of damages,[63] the plaintiff in a civil action need not establish damages with "mathematical precision," as long as a reasonable basis for computation exists.[64] Affidavits were offered documenting services for a one year period, and Brenda testified regarding the nature of her services and supervision after that period. To the extent that Brenda was not providing attendant care services while Wier was in vocational rehabilitation sessions, the rehabilitation records were admitted at trial, thereby allowing the jury to deduce the days on which she was not supervising him for the entire day. The vocational rehabilitation records did not identify the number of hours Wier spent in each session, but his case manager's file contained a limited attendance record showing that the sessions did not exceed 6½ hours. Brenda and Wier testified regarding Brenda's expectation of payment. If the jury credited that testimony, it could find that the charges were incurred.[65] Viewing this evidence in the light most favorable to Wier, as the nonmoving party, the trial court did not err by denying Allstate's motion for a directed verdict.

## V. VERDICT FORM

Lastly, Allstate argues that the verdict form submitted to the jury was so misleading and prejudicial that its use amounted to error requiring reversal. We disagree.

Claims of error challenging a verdict form are reviewed in the same manner as claims of instructional error.[66] A preserved claim of instructional error is generally reviewed de novo.[67] "However, the trial court's determination that a jury instruction is accurate and applicable to the case is reviewed for an abuse of discretion."[68] If a party requests a standard jury instruction, the instruction should be given if it is applicable and accurately states the law.[69] Jury instructions must be viewed as a whole and, "[e]ven if somewhat imperfect, instructions do not create error

---

[63] *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633 (1999).

[64] *Shivers v Schmiege*, 285 Mich App 636, 644; 776 NW2d 669 (2009).

[65] The majority opinion of the *Douglas* Court rejected the notion that a family member's provision of attendant care services in the absence of an insurer's payment is not inconsistent with an expectation of payment, as long as there was some "expectation of payment from the insurer . . . ." *Douglas*, 492 Mich at 267-268 n 56.

[66] See *Jimkoski v Shupe*, 282 Mich App 1, 8-9; 763 NW2d 1 (2008).

[67] *Id*. at 9.

[68] *Hill v Hoig*, 258 Mich App 538, 540; 672 NW2d 531 (2003).

[69] *Chastain v General Motors Corp (On Remand)*, 254 Mich App 576, 590; 657 NW2d 804 (2003). See also MCR 2.512(D)(2).

requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury."[70]

Defense counsel objected to use of the standard verdict form promulgated by the Committee on Model Civil Jury Instructions for use in actions seeking first-party, no-fault benefits. Defense counsel asserted that because the first two questions on the form—i.e., whether the plaintiff sustained an accidental bodily injury and whether that injury arose from the ownership, operation, maintenance, or use of a motor vehicle—were not at issue, a modified form should be used, beginning with the following question: "Did Plaintiff Joseph Wier sustain an accidental bodily injury arising out of the September 9, 1996 motor vehicle accident for which benefits remain due and owing?" The trial court rejected this proposal and, instead, ordered that the first two questions should be answered in the affirmative and that the next standard question—concerning whether allowable expenses have been incurred—could be limited by reference to the date Allstate terminated benefits so as to clarify any ambiguity. Consistent with this ruling, the final verdict form began with the following questions and answers:

QUESTION NO. 1: Did the plaintiff sustain an accidental bodily injury?

Answer: YES

QUESTION NO. 2: Did the plaintiff's accidental bodily injury arise out of the operation or use of a motor vehicle as a motor vehicle on September 9, 1996?

Answer: YES

QUESTION NO. 3: Were allowable expenses incurred by or on behalf of the plaintiff from September 14, 2013 through the present arising out of the accidental bodily injury referred to in QUESTION NO. 2?

(Allowable expenses consist of all reasonable charges for reasonably necessary products, services, and accommodations for the plaintiff's care, recovery, or rehabilitation.)

Answer: _____ (yes or no)

On appeal, Allstate maintains that the use of this verdict form was prejudicial because it essentially instructed the jury that Wier's then-existing condition arose out of the 1996 accident.

Admittedly, the use note for the standard verdict form instructs the trial court to "[o]mit any questions that are not at issue, such as whether the injuries arose out of the ownership, operation, maintenance, or use of a motor vehicle . . . ."[71] Thus, the proposed verdict form offered by Allstate might have been preferable. However, Michigan courts are not legally bound

---

[70] *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

[71] M Civ JI 67.01, n a1.

by the standard jury instructions,[72] let alone their accompanying use notes. More importantly, viewing the verdict form as a whole, we do not believe that the trial court abused its discretion by determining that the modified standard verdict form was applicable to the case and accurately stated the law.

Although inclusion of the first two, preanswered questions was perhaps superfluous, they accurately reflect the elements of proof that a plaintiff must establish as a prerequisite to entitlement to no-fault benefits.[73] As it was undisputed that Wier sustained a TBI in the 1996 accident, the trial court appropriately modified the verdict form by answering these questions in the affirmative, so as to remove those issues from the jury's consideration and thereby make the verdict form more applicable to the case at hand. Finally, by narrowing the third question to a specific time frame, the verdict form emphasized to the jury that the benefits Wier was seeking in connection with his current treatment and expenses must have arisen from the original injury he incurred in 1996 in order to be compensable.

Allstate's contention that the setup of the verdict form compelled the jury to conclude that Wier's condition was necessarily the product of the 1996 accident is especially unpersuasive in light of the supplemental jury instructions provided. The court expressly instructed the jury that Allstate's prior payment of benefits did not establish its liability or preclude Allstate from asserting that no benefits were owed. This reduced the possibility that the jury might mistakenly construe Allstate's concession that Wier sustained a TBI in 1996 as evidence that it remained liable for the more recently incurred, disputed benefits. The court also instructed the jury:

> If you find that Joe Wier developed bipolar disorder unrelated to the September 9, 1996 motor vehicle accident, Joe Wier is not entitled to no-fault benefits as of the onset date of the bipolar disorder.

Accordingly, the jury was fully aware that if it credited Allstate's defense theory, i.e., that Wier's behavioral and emotional functioning were the product of his unrelated bipolar disorder, it should not award no-fault benefits in his favor.[74] Although somewhat imperfect, the combined effect of the verdict form and jury instructions does not amount to an error requiring reversal because it fairly presented the pertinent issues and law to the jury.[75]

---

[72] See *Johnson v Recca*, 492 Mich 169, 207; 821 NW2d 520 (2012).

[73] See MCL 500.3105(1).

[74] If anything, this instruction was overly broad, as it expansively stated that Wier was not entitled to any benefits if he developed bipolar disorder unrelated to the accident, without clarifying that he would only be precluded from recovering no-fault benefits if his claimed allowable expenses were incurred for treatment or care of that condition, rather than his TBI. The fact that the jury, faced with this expansive instruction, still determined that Wier's claimed expenses arose out of the injury he sustained in the 1996 accident demonstrates that the jury did not believe that Wier suffered from, or was receiving treatment for, bipolar disorder.

[75] *Case*, 463 Mich at 6.

## VI.  ATTORNEY FEES

On cross-appeal, Wier argues that the trial court erred by denying his motion for attorney fees.  We disagree.

Review of issues involving attorney fees payable under the no-fault act involves a mixed question of fact and law.[76]  "What constitutes reasonableness is a question of law," and therefore subject to do novo review.[77]  The trial court's determination of the reasonableness of the insurer's denial of benefits is a question of fact, reviewed for clear error.[78]  "A decision is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made."[79]  The trial court's ultimate decision whether to award attorney fees is reviewed for an abuse of discretion.[80]

After obtaining a jury verdict in his favor, including an award of no-fault penalty interest, Wier moved for attorney fees and taxable costs pursuant to MCL 500.3148(1).  At oral argument, plaintiff's counsel asserted that it was unreasonable for Allstate to rely on Dr. Hanks's December 29, 2014 IME report to deny benefits because Dr. Hanks invalidated the test results concerning Wier's "emotional psychiatric, psychological issues," and relied, instead, on her own unsupported subjective analysis to opine that Wier's condition was not related to the 1996 TBI.  Plaintiff's counsel maintained that Allstate's reliance on Dr. Hanks's opinion was unreasonable because the report was worthless without an objective basis for the opinion.  Defense counsel argued that Allstate's reliance on Dr. Hanks's IME report was reasonable and that even if the report "should have raised a question," Allstate also had Dr. Kezlarian's IME report by the time it issued the final denial of benefits.  The trial court denied Wier's motion for benefits, reasoning that Allstate had a right to rely on expert opinions, even if the experts' testimony at trial was "imperfect at best."

MCL 500.3148(1) calls for an award of attorney fees to the claimant in a no-fault action if two prerequisites are met:

> First, the benefits must be overdue, meaning "not paid within 30 days after [the] insurer receives reasonable proof of the fact and of the amount of loss sustained." MCL 500.3142(2).  Second, in postjudgment proceedings, the trial court must find that the insurer "unreasonably refused to pay the claim or unreasonably delayed in making proper payment." MCL 500.3148(1).[81]

---

[76] *Ross v Auto Club Group*, 481 Mich 1, 7; 748 NW2d 552 (2008).

[77] *Id*.

[78] *Id*.

[79] *Id*. (quotation marks and citation omitted).

[80] *Brown v Home-Owners Ins Co*, 298 Mich App 678, 690; 828 NW2d 400 (2012).

[81] *Moore v Secura Ins*, 482 Mich 507, 517; 759 NW2d 833 (2008) (alteration in original).

If a claimant establishes that benefits were overdue pursuant to MCL 500.3142(2), a rebuttable presumption of unreasonableness arises.[82] The insurer can rebut this presumption by showing that its nonpayment was justified based upon a "legitimate question of statutory construction, constitutional law, or factual uncertainty."[83] "[T]he court must examine the circumstances as they existed at the time the insurer made the decision, and decide whether that decision was reasonable at that time."[84] Accordingly, the insurer's refusal to pay benefits may be deemed reasonable at the time the decision was made, even if the insurer is later determined to be liable for those benefits.[85]

Wier argues that the trial court erred by denying its motion for attorney fees because it agreed that Dr. Hanks's report did not justify the termination of benefits and because Dr. Kezlarian's report cannot serve as a basis for the termination, having been completed after benefits were terminated. Wier correctly asserts that the record is unclear as to whether the trial court determined that Dr. Kezlarian's report preceded Allstate's decision to terminate benefits. The ambiguity of the record in this regard is of little consequence because the record suggests that the trial court was ultimately persuaded by Allstate's *legal* argument, rather than its factual determination concerning the sequence of events.

In articulating his criticism of Dr. Hanks's opinion, plaintiff's counsel referred to her IME report *and* trial testimony. The trial court agreed that Dr. Hanks's determination was "totally subjective," observed that her testimony was unconvincing, and said, "I don't think the denial on the basis of Hanks['s] testimony, the report was sufficient as a reasonable basis." When defense counsel asked what made the report unreasonable, the following exchange occurred:

> *The Court*: Her report was a totally subjective analysis. There was no objective findings based on her determination in her evaluation. The reports she discounted for whatever reason that she just decided to discount, the test results, and the prior test results. There was really no basis for her determination.
>
> [*Defense Counsel*]: But when you look at the report, and *that's what Allstate had available to it when adjusting the claim*, and what they had available, was nothing here is related to the motor vehicle accident.
>
> So, then even if—if your Honor is saying it should have raised a question, then we have Dr. Kezlarian's report. So *what do they know at the time of the denial? What happened at trial isn't determinative.* It's at the time of the denial,

---

[82] *Brown*, 298 Mich App at 690-691.

[83] *Id*. at 691.

[84] *Id*.

[85] *Moore*, 482 Mich at 525-526.

and we have these two reports that support the fact that no further benefits were needed because of the accident related injuries.

> *The Court*: I have to agree with you.
>
> Look, it's on appeal.
>
> [*Plaintiff's Counsel*]: They are appealing [the judgment] no matter what. They said you're wrong.
>
> *The Court*. And you're going to get the same appeal because I'm thinking it is sufficient even if the experts that come during the trial testify that there is a basis of—indicating that these were not causal or not related to the auto accident and were imperfect at best, it's still a basis for their making the determination not to pay benefits, and I think they have a right to rely on the experts. I'm going to deny the motion for attorney fees. [Emphasis added.]

Despite the reference to Dr. Kezlarian's IME report, we infer from the above colloquy that the trial court's ruling rested on its recognition that Allstate correctly argued that the question of reasonableness must be determined based on the circumstances that existed at the time of the insurer's decision to cease payment.[86] Presumably, this recognition caused the trial court to reevaluate the circumstances without taking its opinion regarding the credibility of Dr. Hanks's trial testimony into account.

Dr. Hanks's IME report detailed the history she learned from her interview with Wier, as well as a thorough review of his medical records. The results of her neuropsychological testing suggested that Wier's cognitive abilities were within normal limits, with the exception of his fine motor speed, which was an impairment he struggled with before the accident. Dr. Hanks reported the following results concerning Wier's personality testing:

> With regard to the scores on the MMPI-2-RF [Minnesota Multiphasic Personality Inventory – 2nd Edition – Restructured Form], the validity scales revealed a tendency towards a non-cooperative test-taking approach. His performance on the infrequent responses validity scale on the MMPI-2-RF revealed over-reporting and inconsistent responding. His performance on the response bias scale was also high and showed inconsistent responding. As such, the substantive scores were deemed invalid and his reported emotional and personality scores on that measure could not be interpreted.

In the impressions and conclusions section of her report, Dr. Hanks opined that the irritability and temper problems that arose early in Wier's high school career appeared to develop into "more of a psychiatric condition involving paranoid ideation, suspiciousness, and antisocial personality traits." She observed that Wier's behaviors were "above and beyond what would be

---

[86] *Brown*, 298 Mich App at 691.

expected by a mild complicated brain injury," and that "these behaviors especially the psychiatric condition occur frequently in young adulthood." According to Dr. Hanks, Wier's brain injury "resolved quite well, and these other factors appear to be comorbid but not causative to the motor vehicle collision." She concluded with the following impression concerning Wier's emotional functioning:

> Unfortunately, given his non-cooperative test-taking approach on the MMPI-2-RF, one cannot talk about his current emotional presentation; however, in the clinical interview he denied any significant depressive or anxiety symptoms, and stated that he was doing quite well. He appears to feel that the medications that he has are beneficial, and that the treatment he is receiving is also very enjoyable and beneficial; however, I do not believe those things are directly related to the automobile accident, and instead related to comorbid conditions such as psychiatric and antisocial personality history.

Dr. Hanks clearly stated that she was unable to rely on the results of Wier's personality testing, and fully explained the reason she reached that conclusion. While this left her without objective data to interpret, she was apparently of the opinion that the insight she gleaned from her clinical interview with Wier and review of years of voluminous medical records, coupled with her personal experience treating individuals with TBIs, provided sufficient information for her to reach an opinion regarding the cause of Wier's then-existing condition. Although the credibility of this position was undermined at trial, at the time Allstate decided to terminate the majority of Wier's claimed benefits, it knew only that it had retained a highly credentialed expert who explicitly opined that Wier's claims for attendant care, residential care, recreational therapy, and vocational rehabilitation did not arise from his 1996 injury.[87] Remski testified that Dr. Hanks was selected to perform the IME because of her credentials and specialization in neuropsychology and treating individuals with TBIs. Given its understanding of her particular qualifications, it was not unreasonable for Allstate to presume that Dr. Hanks would not have expressed a conclusive opinion if she was unequipped to do so. The reasonableness of Allstate's reliance on the IME report is further supported by the factual uncertainty surrounding Wier's claim arising from the unusually long gap in Wier's treatment and the inconsistent information contained in available records.

---

[87] Dr. Hanks's decision to render an opinion without the benefit of objective testing results distinguishes this matter from similar cases in which an insurer's reliance on a deficient IME report was deemed unreasonable. For example, in *Tinnin v Farmers Ins Exch*, 287 Mich App 511, 516-517; 791 NW2d 747 (2010), the insurer denied all treatment in reliance on an IME report that did not address whether it would be reasonable for the claimant to obtain treatment on an "as needed" basis. This Court held that the insurer's complete denial of the claimant's treatment without clarifying the expert's opinion was unreasonable. By contrast, Dr. Hanks explicitly opined that Wier's brain injury had "resolved quite well," and that each of the benefits Allstate denied on the basis of her report were not causally related to Wier's 1996 injury.

In sum, Allstate reasonably relied on Dr. Hanks's report to support its decision to deny the specific benefits it terminated on January 13, 2015. It did not deny the remainder of the available PIP benefits until after it received Dr. Kezlarian's IME report similarly opining that Wier's present condition was attributable to factors other than the 1996 accident. Accordingly, the trial court properly denied Wier's motion for attorney fees.

Affirmed.

/s/ Michael J. Talbot
/s/ Jane M. Beckering
/s/ Thomas C. Cameron