THORNHILL v CITY OF DETROIT

Docket No. 77971. Submitted October 2, 1984, at Detroit.—Decided
February 28, 1985.

Vivian R. Thornhill, administratrix of the estate of Norman
Earnest, brought an action for wrongful death in the Wayne
Circuit Court against the City of Detroit, the Detroit Fire
Department, and the Emergency Medical Service Division
(EMS) and several of its technicians whose identities were
unknown. Plaintiff's decedent allegedly died because of the
negligence of the technicians in failing to keep Mr. Earnest's
throat clear while transporting him to the hospital. The techni-
cians were later dismissed as parties defendant. A jury re-
turned a verdict of no cause of action in favor of the remaining
defendants and judgment was entered, Roland L. Olzark, J.
Plaintiff applied for leave to appeal, which was denied. Plaintiff
applied for leave to appeal in the Supreme Court which, in lieu
of leave to appeal, remanded to the Court of Appeals for
consideration as on leave granted, 419 Mich 870 (1984). *Held:*

1. The trial court erred in excluding the testimony of an
expert witness as to the probable cause of death because the
testimony lacked a reasonable degree of certainty. However,
the testimony was properly excludable because it was based on
assumptions that did not accord with the established facts and
was, therefore, irrelevant.

2. The court properly instructed the jury that plaintiff had to
show gross negligence or wilful misconduct before the City of
Detroit could be held liable for the acts or omissions of its EMS
technicians. The former statute that granted limited immunity
for negligent acts or omissions in the giving of emergency
medical treatment outside of a hospital applies not only to the
persons directly responsible for the injury but also to the
institutions and personnel whose liability, if any, would be
vicarious or derivative.

Affirmed.

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur 2d, Expert and Opinion Evidence § 16 *et seq.*

[2] 40 Am Jur 2d, Hospitals and Asylums §§ 2, 14 *et seq.*

Construction of "Good Samaritan" statute excusing from civil liabil-
ity one rendering care in emergency. 34 ALR3d 222.

SHEPHERD, P.J., dissented. He believed that the testimony of the expert witness was based in part upon his earlier observations and should have been admitted.

1. EVIDENCE — OPINION EVIDENCE — RULES OF EVIDENCE.

A trial court may require that underlying facts or data essential to an opinion be in evidence prior to admission of the opinion (MRE 703, 705).

2. GOVERNMENTAL IMMUNITY — TORTS — HOSPITALS — EMERGENCY MEDICAL SERVICES.

The former statute that granted limited immunity for negligent acts or omissions in the giving of emergency medical treatment outside of a hospital applies not only to the persons directly responsible for the injury but also to the institutions and personnel whose liability, if any, would be vicarious or derivative (MCL 338.1925; MSA 14.528[455], repealed by 1978 PA 368).

*Larkin, Worsham & Victor, P.C.* (by *Larry A. Smith*), for plaintiff.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C.* (by *Robert G. Kamenec*), for defendants.

Before: SHEPHERD, P.J., and WAHLS and J. W. FITZGERALD,* JJ.

PER CURIAM. Plaintiff commenced an action for the wrongful death of Norman Earnest, allegedly due to the negligence of certain Emergency Medical Services technicians in not keeping clear Mr. Earnest's throat while transporting him to the hospital. The technicians were dismissed from the action, having immunity under MCL 338.1925; MSA 14.528(455) (repealed by 1978 PA 368). A jury returned a verdict of no cause of action in favor of the remaining defendants. Plaintiff's delayed ap-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment.

peal is now before us, on remand from the Supreme Court, "for consideration as on leave granted". 419 Mich 870 (1984).

Plaintiff first predicates error upon the trial court's ruling excluding the expert testimony of Dr. Wilcox that decedent probably died after aspirating his vomitus. The court ruled that the testimony was "immaterial" because it was not proved that decedent had vomitus in his mouth during the relevant time period. We affirm, but for reasons different from those expressed by the trial court.

The trial court may require that underlying facts or data essential to an opinion be in evidence prior to admission of the opinion. MRE 703, 705. The court was thus justified in requiring some proof that decedent had vomited before or during the trip to the hospital. Plaintiff's offer of proof included deposition testimony of an expert witness that froth found in decedent's mouth "probably was vomitus". To this the court stated that the witness had not testified in terms of "a reasonable degree of certainty". To the extent that the court was demanding talismanic phraseology, error occurred. *Knoper v Burton,* 12 Mich App 644, 650-651; 163 NW2d 453 (1968), *rev'd on other grounds* 383 Mich 62; 173 NW2d 202 (1970). However, the court also said of plaintiff's offer of proof that it was "befuddling" and the court could not tell if the witness really had the facts necessary for his conclusion. Having reviewed the testimony, we find that the expert's opinion was objectionable because it was based on assumptions that did not accord with the established facts.

The crucial portion of the excluded testimony is set forth here for ease of reference:

"*Q.* When you saw the patient was there any indica-

tion in those notes that you have left that, in fact, the patient had vomited?

"*A.* I noted that the oral cavity was filled with a frothy-type material. The record does not indicate exactly what the material was.

"*Q.* What would that mean to you?

"*A.* Well, it has to be interpreted in the light of many other things that we see in the record.

"*Q.* All right. I am asking you at this point—

"*A.* It is not a good sign.

"*Q.* I understand that it is not a good sign, but would you interpret for us and help us understand what you meant when you wrote that in the notations or what you were observing at that time?

"*A.* Well, it is kind of difficult for me to understand exactly what you mean, but—this material—let's assume that all of this occurred in a very short period of time. It is probably—

\*    \*    \*

"*A.* Okay. If we assume that all of this occurred in a reasonably short period of time, we would have to assume—if I noted it in the record, there was probably considerable volume of material and that it probably was vomitus.

"*Q. (By Mr. Worsham):* When you refer to an assumption that it occurred in a short period of time—the record of the EMS Service indicates that they were dispatched from the Fire Department at two twenty-eight. Would the period of time between two twenty-eight and two forty, when the first medication is given, assuming that they had to go from the Fire Department to the residence, pick up the patient from a second-floor bedroom and transport the patient to Northwest General, would that be the time span that you would consider to be a short period of time?

"*A.* Yes, sir.

"*Q.* So would that fall within that category that you have referred to before?

"*Mr. Rice:* Would that fall in that category?

"*Q. (By Mr. Worsham):* Would that time span fall within the short period of time category so we may

assume that this was vomitus material in the oral cavity?

"*A.* Yes, as opposed to a frothy-type material that we might see in a debilitated patient in failure where we have severe pulmonary edema. We sometimes have a frothy material come from the lungs and, typically, they foam at the mouth, but this would be—this is a long-term process. Today, we are talking about a short process, okay? I would have to assume that there would not have been time for this other process to have been going on."

From this testimony, it is clear that the probablity of vomitus rested on the assumption of a time period of short duration, which was defined to be 2:28 to 2:40 p.m. However, it is undisputed that decedent had been frothing at the mouth for a period of unknown duration prior to 2:28 p.m. He was found by his landlady in that condition in his room and remained in that condition when the EMS team arrived. That Dr. Wilcox did not include in his opinion this earlier period during which decedent was frothing at the mouth is clear from the following testimony:

"*Q.* There has been testimony that when the EMS technicians arrived at the home of Mr. Earnest shortly after two twenty-eight after dispatch, that they found Mr. Earnest lying in his bed frothing at the mouth at that time. This is prior to coming to Northwest Hospital.

"Would you have an opinion to what was causing the frothing?

"*A.* It would be very difficult for me to say at this time. There are a number of things that could cause this.

"*Q.* You would not be able to say within a reasonable degree of medical certainty whether he was suffering from a pulmonary edemic or edemic congestion—congestive disease or whether he was vomiting; is that true?

"*A.* Well, as I testified before, patients with pulmonary edema severe enough to have frothing at the mouth, it is normally more of a long-term type deal and I have seen the patients a couple days before and I don't think that pulmonary edema, to this degree, would develop in that length of time.

"This is a man that is *[sic]*, apparently, lived a reasonably normal life and I don't think that would have been the cause."

In this portion of the testimony, Dr. Wilcox acknowledged a number of causes of frothing but attempted to rule out only one cause. There is thus no suggestion that vomiting was the cause.

Because Dr. Wilcox offered his opinion of vomitus on the assumption that the frothing occurred after the EMS team arrived, while the facts clearly show that the frothing commenced prior to the team's arrival, we conclude that the opinion was irrelevant to the issues at trial as framed by the facts. Exclusion of Dr. Wilcox's opinion that decedent vomited and thereafter aspirated the vomitus was, therefore, proper. Exclusion of Dr. Maier's opinion was also proper, because the latter opinion was based in turn on Dr. Wilcox's opinion which, as we have just held, was without a sufficient factual basis.

Plaintiff next argues that it was error to instruct the jury that plaintiff had to show gross negligence or wilful misconduct before the City of Detroit could be held liable for the acts or omissions of its EMS technicians. We find no error. This Court has held that there is no derivative immunity of the master from the servant in the absence of a statute to the contrary. *Hamburger v Henry Ford Hospital,* 91 Mich App 580, 589; 284 NW2d 155 (1979), *lv den* 407 Mich 942 (1979). Here, the jury instruction was given on the basis that such a statute existed. MCL 338.1925; MSA 14.528(455)

(repealed by 1978 PA 368) provided at the time of the alleged negligence:

"An act or omission of an attendant or emergency medical technician while rendering emergency medical services, or advanced emergency medical technician while rendering advanced emergency medical services, performed or omitted in good faith when the services are consistent with their training, shall not impose liability upon the attendant, emergency medical technician, advanced emergency medical technician, authorizing physicians or registered nurse, personnel providing communications services or lawfully operating or utilizing supportive electronic communications devices, the ambulance operation, the hospital, or the officers, members of the staff, nurses, *or other employees of the hospital or the authoritative governmental unit or units,* if the life of the patient is in immediate danger, unless the act or omission was the result of gross negligence or wilful misconduct, and if the services are rendered outside of a hospital." (Emphasis added.)

Plaintiff contends that this statute grants limited immunity to "the * * * employees of * * * the authoritative governmental unit" and not to the governmental unit itself. We disagree with plaintiff's construction of the statute and hold that liability of the authoritative governmental unit is limited.

Plaintiff draws a comparison to the "good samaritan" statute, MCL 691.1502; MSA 14.563(12), which was considered in *Hamburger, supra,* and held not to grant derivative immunity to the hospital. We find that statute inapposite as it did not at all address derivative immunity. In contrast, the provision presently under review grants limited immunity not only to the EMS technicians, who may be directly responsible for injury to a patient, but also to institutions and personnel whose liability, if any, would be vicarious or derivative. While granting immunity to ambulance operations and hospitals, the Legislature did not

intend to omit the cities which operate an Emergency Medical Service.

Affirmed.

SHEPHERD, P.J. *(dissenting).* Even though there is considerable evidence in the record that the testimony of Dr. Wilcox is either weak or incorrect, I believe that his testimony should have been admitted into evidence. His opinion was based on the assumption that the substance observed in the mouth of the decedent accumulated within a relatively short period. He testified that he would have observed a condition of pulmonary edema when he examined the decedent a few days earlier if such a condition had existed. His opinion, therefore, was in part based upon earlier observation. The two witnesses who called the EMS testified that they had not seen the decedent since 9 o'clock the previous evening. They observed him frothing at the mouth after breakfast. The majority's opinion seems to assume that the frothy substance could not have been vomitus if it was observed before the EMS technicians arrived. However, we do not know whether the substance began to accumulate immediately before the arrival of the EMS or whether it had been accumulating for several hours before their arrival. Nor do we have in the record a precise definition of the meaning of "a long time".

This points to the weakness and/or inaccuracy of Dr. Wilcox's testimony. Nevertheless, since he did opine that pulmonary edema would have been observable in his earlier examination and that he did not find it, he should have been allowed to testify that the frothy substance was probably vomitus. The testimony of the defense witnesses may very well have overcome the testimony of Dr. Wilcox but I believe there was enough in the record to permit the testimony to go to the jury.