*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANNY KHOSHO, Personal Representative of the
ESTATE OF ZUHAIR KHOSHO,

        Plaintiff-Appellee/Cross-Appellee,

v

ASCENSION MACOMB OAKLAND HOSPITAL,
doing business as ST. JOHN OAKLAND
HOSPITAL, GLENDALE NEUROLOGICAL
ASSOCIATES PC, doing business as MICHIGAN
INSTITUTE FOR NEUROLOGICAL DISORDERS,
and MARTIN I. BELKIN, D.O.,

        Defendants-Appellants,

and

MARY N. MEGALLY, D.O., MICHAEL R.
LAFFER, D.O., OAKLAND MEDICAL
GROUP/MILLENNIUM PULMONARY SLEEP
CLINIC, METRO INFECTIOUS DISEASE
CONSULTANTS, AGY MEDICAL GROUP,
FARMINGTON HILLS MEDICAL GROUP,
MICHIGAN HEALTHCARE PROFESSIONALS,
and HAZEL PARK MEDICAL CENTER,

        Defendants,

and

ROBERT G. SMITH, D.O.,

        Defendant/Cross-Appellant.

UNPUBLISHED
October 29, 2025
8:43 AM

No. 367875
Oakland Circuit Court
LC No. 2020-183276-NH

Before: YOUNG, P.J., and LETICA and KOROBKIN, JJ.

PER CURIAM.

-1-

In this medical-malpractice action, defendants, Ascension Macomb Oakland Hospital, doing business as St. John Oakland Hospital, Glendale Neurological Associates PC, doing business as Michigan Institute For Neurological Disorders (MIND), and Dr. Martin I. Belkin, D.O. (the "Ascension defendants"), appeal by leave granted from three orders entered on August 31, 2023 by the Oakland Circuit Court. The court denied the Ascension defendants' motion to strike the standard-of-care expert of plaintiff, Danny Khosho, personal representative of the Estate of Zuhair Khosho, and their motions for summary disposition under MCR 2.116(C)(10) regarding causation and direct liability. Defendant, Dr. Robert G. Smith, D.O., has cross-appealed to challenge the September 7, 2023 circuit court order denying his motions for summary disposition under MCR 2.116(C)(10). For the reasons that follow, we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This medical-malpractice action arises out of the death of decedent, 61-year-old Zuhair Khosho ("Mr. Khosho"). In 2011, Mr. Khosho was diagnosed with myasthenia gravis, which causes weakness in the muscles, including those required to breathe, and he received ongoing treatment from defendant, Dr. Belkin. On September 7, 2015, Mr. Khosho went to St. John Oakland Hospital ("Ascension"), complaining of difficulty breathing. Plaintiff, Mr. Khosho's son Danny, contended Mr. Khosho was having a myasthenic crisis[1] and required acute treatment. Mr. Khosho was admitted to Ascension's Intensive Care Unit (ICU), placed on a ventilator, was treated with two antibiotics, Cefepime and Clindamycin, and received plasmapheresis. Dr. Belkin, a neurologist, and Dr. Smith, an infectious disease specialist, were responsible for his care. A bacteria culture collected at Ascension on September 10, 2015, showed three types of bacteria present in Mr. Khosho's body, but did not show pseudomonas bacteria.[2] Despite the treatment Dr. Belkin prescribed, Mr. Khosho's white blood cell count continued to increase, indicating he was fighting an infection. On September 18, 2015, Mr. Khosho was weaned off the ventilator, but that was unsuccessful, and he was intubated again on September 22, 2015. On September 21, 2015, Dr. Smith prescribed other antibiotics: Meropenem and Vancomycin.

On September 24, 2015, Mr. Khosho was transferred to Henry Ford at plaintiff's request. At Henry Ford, he received different steroids and more antibiotics, and was extubated again on

---

[1] A myasthenic crisis "occurs when the respiratory muscles get too weak to move enough air in and out of the lungs. The person is unable to breathe and a machine (ventilator) is necessary to help them breathe." Myasthenia Gravis Foundation of America, *MG Emergencies* <https://myasthenia.org/living-with-mg/mg-emergency-preparedness/mg-emergencies/> (accessed October 27, 2025).

[2] Pseudomonas is a group of bacteria commonly found in soil and water, and can cause pneumonia. Center for Disease Control, *About Pseudomonas aeruginosa* <https://www.cdc.gov/pseudomonas-aeruginosa/about/index.html> (accessed October 27, 2025). A pseudomonas infection is common in the hospital environment and can occur from the use of a ventilator. The pseudomonas bacteria is resistant to certain antibiotics and an infection can be potentially deadly for those with a weakened immune system. Cleveland Clinic, Pseudomonas Aeruginosa Infection <https://my.clevelandclinic.org/health/diseases/25164-pseudomonas-infection> (accessed October 27, 2025).

October 9, 2015. By October 19, 2015, he had improved to baseline mental status and was able to make his own medical decisions. However, he developed pseudomonas pneumonia, and eventually was reintubated. Mr. Khosho experienced numerous complications and died on November 13, 2015, from respiratory failure, necrotizing pseudomonas pneumonia, and myasthenia gravis. The parties dispute whether Mr. Khosho had pseudomonas bacteria while at Ascension and whether the treatment, or lack of treatment, at Ascension caused his death months later while at Henry Ford.

Plaintiff filed the instant medical-malpractice suit in September 2020. Plaintiff alleged negligence against Dr. Belkin for administering high doses of steroids and plasmapheresis to Mr. Khosho for a prolonged period, and for failing to decrease the steroids once Mr. Khosho showed signs of pneumonia or sepsis. Plaintiff also alleged the Ascension defendants breached their duty to hire and train their agents, and to ensure proper policies and procedures were adopted and followed. Plaintiff contended Dr. Smith failed to recognize Mr. Khosho had multiple risk factors for pneumonia, including his intubation and his high doses of steroids which can mask signs of serious infections, and that Dr. Smith should have ordered additional studies to evaluate Mr. Khosho and changed antibiotic therapy accordingly. In an amended complaint, plaintiff specifically alleged Dr. Smith was liable because he did not treat pseudomonas, did not order broad spectrum antibiotics from September 19, 2015 until September 23, 2015, and did not timely order or appropriately administer the antibiotics Meropenem or Vancomycin.

In support of his complaint, plaintiff provided affidavits of merit from neurologist Dr. Chitra Venkatasubramanian, M.D., infectious disease specialist Dr. David B. Ross, M.D., and internal medicine and pulmonology specialist Dr. Robert Irwin, M.D.

The Ascension defendants moved to strike Dr. Venkatasubramanian as the standard-of-care expert regarding Dr. Belkin because Dr. Venkatasubramanian spent the majority of her time practicing subspecialties vascular neurology and neurocritical care, not general neurology. Plaintiff responded that Dr. Venkatasubramanian, as a neurologist, was qualified to testify regarding the standard of care for Dr. Belkin, another neurologist. Plaintiff argued the fact that Dr. Venkatasubramanian is also certified in vascular neurology and neurocritical care should not disqualify her because, at the time of Mr. Khosho's myasthenic crisis, Dr. Belkin was treating him in the way a neurocritical neurologist would.

The Ascension defendants also moved for summary disposition under MCR 2.116(C)(10) for lack of causation, or in the alternative for a *Daubert*[3] hearing. They contended plaintiff had not provided expert testimony that Dr. Belkin's actions or omissions supported a causal connection to the damages, especially where, contrary to Dr. Venkatasubramanian's testimony that Mr. Khosho would never be able to wean off the ventilator, he was extubated and improved to baseline status at Henry Ford. Plaintiff responded that Dr. Venkatasubramanian's position had support because Mr. Khosho could not be *successfully* removed from the ventilator and he was ventilator-dependent until his death. Plaintiff asserted a *Daubert* hearing was unnecessary because

---

[3] *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

defendants did not show that Dr. Venkatasubramanian's opinions were without a sound scientific foundation.

Also, the Ascension defendants moved for partial summary disposition, again under MCR 2.116(C)(10), on the direct claims against Ascension and MIND (Dr. Belkin's employer), arguing in part that Dr. Venkatasubramanian did not offer any opinions on their employment, training, monitoring, policies, and procedures. In his answer, plaintiff cited Dr. Venkatasubramanian's affidavit of merit to support the allegations of direct liability against the Ascension defendants and maintained that a jury should decide the issue of proximate cause.

Dr. Smith filed several related motions for summary disposition under MCR 2.116(C)(10). In the two relevant to his cross-appeal, Dr. Smith asserted that Mr. Khosho never had pseudomonas while he was at Ascension, and, even if he did, antibiotics Cefepime and Meropenem, which were given to Mr. Khosho at Ascension, treated pseudomonas. Dr. Smith also argued the testimony of plaintiff's experts was inconsistent: Dr. Irwin had no criticism of the timing and choice of antibiotics before September 20, 2015, but Dr. Venkatasubramanian testified that Mr. Khosho's immune system shut down past "the point of no return" before that date. Dr. Smith sought summary disposition or, alternately, a *Daubert* hearing.

Plaintiff responded that expert testimony established the existence of a genuine issue of material fact regarding whether Mr. Khosho had pseudomonas at Ascension. Plaintiff also argued Dr. Irwin had criticisms of Dr. Smith, who failed to treat the infection before it damaged Mr. Khosho's lungs. Dr. Venkatasubramanian testified that had Dr. Smith treated Mr. Khosho appropriately, he would have survived. Further, Dr. Ross opined that Dr. Smith gave the wrong antibiotics and gave antibiotics too late, and stated it was more likely than not Mr. Khosho would have survived had the treatment been appropriate.

At the motion hearing, the court declined to strike Dr. Venkatasubramanian as an expert, ruling in relevant part:

> [T]he Court does find that Doctor [Venkatasubramanian] is a board certified neurologist and therefore is gonna deny any request for a *Daubert* hearing 'cause I do believe that this expert could provide proper, uh, testimony in regards to, uh, her position as a neurologist. However, I—I will tell both Defense Counsel, there obviously sounds like there is a lot of questions on cross-examination regarding how the doctor was able to reach her conclusion.
>
> But I don't believe a *Daubert* hearing is necessary. Uh, and I also find that she is, uh, appropriate and I am not going to strike her as a witness.

Regarding causation, the court decided questions of fact precluded summary disposition:

> The Court having reviewed pleadings, hearing oral argument, the Court is gonna address causation, lack of causation regarding MIND, Doctor Belkin, and Doctor Smith. Uh, after reviewing the entirety of the record, the Court does find that there is a question of fact for a fact finder.

The court ruled that the antibiotic question remained at issue, stating in part:

I'm gonna find that the—the medication that was administered at (indiscernible) [sic-Ascension] that's the heart of the case is what the entire argument has been for the past hour we spent on this record is ultimately gonna be a question of fact for the fact finder.

The court also ruled that the time frame of the administration of antibiotics, specifically whether a material delay occurred, was a question of fact. The resulting orders denied the motions for the reasons on the record.

Defendants filed separate applications for leave to appeal. This Court granted leave to Ascension, and denied leave to Dr. Smith.[4] Dr. Smith cross-appealed. Proceedings have been stayed pending appeal.

## II. ANALYSIS

### A. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's decision regarding whether an expert witness is qualified. *Tate v Detroit Receiving Hosp*, 249 Mich App 212, 215; 642 NW2d 346 (2002). Also, a trial court's decision regarding a motion to strike is discretionary. *Kalaj v Khan*, 295 Mich App 420, 425; 820 NW2d 223 (2012). An abuse of discretion results when the trial court's decision is "outside the range of principled outcomes." *Shivers v Covenant Healthcare Sys*, 339 Mich App 369, 374; 983 NW2d 427 (2021) (quotation marks and citation omitted). Further, this issue involves the interpretation of MCL 600.2169, which is a question of law for de novo review. *Estate of Carlsen v Southwestern Mich Emergency Servs, PC*, 338 Mich App 678, 693; 980 NW2d 785 (2021).

We review orders regarding summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A court correctly grants summary disposition where, excepting damages, "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). A genuine issue of material fact exists when the record, giving the benefit of all reasonable doubt to the opposing party, leaves open an issue over which reasonable minds might differ. *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 609; 566 NW2d 571 (1997). Courts are liberal in finding a genuine issue of material fact. *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008). Accordingly, "a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Patel v FisherBroyles*, *LLP*, 344 Mich App 264, 271; 1 NW3d 308 (2022) (quotation marks and citation omitted). However, a party's "mere pledge to establish an issue of fact at trial cannot survive summary disposition under MCR 2.116(C)(10)." *Maiden*, 461 Mich at 121. A court considering

---

[4] *Estate of Khosho v Ascension Macomb Oakland Hosp*, unpublished order of the Court of Appeals, entered March 1, 2024 (Docket No. 367875), and *Estate of Khosho v Ascension Macomb Oakland Hosp*, unpublished order of the Court of Appeals, entered March 1, 2024 (Docket No. 367979).

a motion for summary disposition under MCR 2.116(C)(10) must not assess credibility or make factual findings. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994).

We review de novo questions of law, including jurisdiction. *Kilpatrick v Lansing Community College*, 348 Mich App 44, 50; 17 NW3d 689 (2023). Likewise, a de novo standard applies to issues relating to the construction of court rules and their application. *True Care Physical Therapy, PLLC v Auto Club Group Ins Co*, 347 Mich App 168, 175; 14 NW3d 456 (2023).

## B. EXPERT QUALIFICATIONS

Defendants argue plaintiff's expert, Dr. Venkatasubramanian, is not qualified to testify regarding Dr. Belkin because the doctors do not share the same specialty. The trial court did not have the benefit of *Stokes v Swofford*, 514 Mich 423; 22 NW3d 97 (2024). Applying *Stokes* here, we affirm the order denying the motion to strike.

### 1. MCL 600.2169(1) – CRITERIA FOR EXPERT WITNESSES IN MEDICAL MALPRACTICE CASES

In a medical-malpractice case, the plaintiff must show: (1) the applicable standard of care for defendant's conduct, (2) breach of that standard by defendant, (3) that plaintiff sustained injury, and (4) proximate causation between the alleged breach and the injury. *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 533; 854 NW2d 152 (2014). The plaintiff must establish the defendant failed to provide the applicable standard of care, typically by offering expert testimony. *Danhoff v Fahim*, 513 Mich 427, 432; 15 NW3d 427 (2024). The party offering an expert witness must show that the witness is knowledgeable regarding the applicable standard of care. *Decker v Rochowiak*, 287 Mich App 666, 685; 791 NW2d 507 (2010).

MCL 600.2169(1) states an expert witness in an action alleging medical malpractice must be licensed as a health professional in Michigan or another state and meet the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.

(b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

(*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health

-6-

profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty. . . .

(c) If the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

(i) Active clinical practice as a general practitioner.

(ii) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed. [MCL 600.2169(1).]

## 2. CASELAW BEFORE *STOKES*

In *Woodard v Custer*, 476 Mich 545; 719 NW2d 842 (2006), overruled in part by *Stokes*, 514 Mich 423, our Supreme Court considered MCL 600.2169 and drew a distinction between a "specialty" and a "subspecialty." Regarding specialists, the Court stated that "a specialist can only devote a *majority* of his professional time to *one* specialty." *Woodard*, 476 Mich at 560. The Court concluded that § 2169(1) required the plaintiff's expert to match the relevant one of the defendant physician's specialties. *Woodard*, 476 Mich at 560. The *Woodard* Court also held:

Therefore, in order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. [*Id*. at 566.]

Two cases from this Court, both applying *Woodard*, addressed Dr. Venkatasubramanian's expert qualifications for standard-of-care testimony, reaching opposite conclusions. In *Estate of Perez v Henry Ford Health Sys*, unpublished per curiam opinion of the Court of Appeals, issued December 4, 2018 (Docket No. 340082),[5] cited by the Ascension defendants, the defendant hospital raised the same argument as the Ascension defendants here—that Dr. Venkatasubramanian, who is board-certified in general neurology, neurocritical care, and vascular neurology, and devoted a majority of her professional practice to neurocritical care, was not qualified under MCL 600.2169(1) to provide standard-of-care testimony against the defendant doctor, who was board-certified in general neurology, and not in neurocritical care. Relying on *Woodard*, this Court concluded in *Perez* that Dr. Venkatasubramanian did not spend a majority of

---

[5] This Court is not bound by unpublished opinions but may consider them persuasive. *Warren City Council v Fouts*, 345 Mich App 105, 112 n 1; 4 NW3d 79 (2022).

her professional time practicing general neurology during the relevant time. *Perez*, unpub op at 7. Four years later, in *Maxey v Botsford Gen Hosp*, unpublished per curiam opinion of the Court of Appeals, issued February 17, 2022 (Docket Nos. 353920 & 356404), this Court reached the opposite conclusion, rejecting the defendants' challenge to the denial of their motion to strike Dr. Venkatasubramanian as an expert witness regarding the defendant, a neurologist.

In *Maxey*, the defendant doctor specialized in general neurology, and no other subspecialty, and this Court stated: "[a]ccordingly, [the] plaintiffs' expert had to have a specialty in general neurology and devote more than 50 percent of his or her professional time to general neurology. Overlap between general neurology and an expert's subspecialties cannot count toward determining which specialty was each expert's majority practice." *Maxey*, unpub op at 11. This Court ruled the trial court did not abuse its discretion when it denied the motion to strike because Dr. Venkatasubramanian averred she spent the year immediately preceding the alleged malpractice in *Maxey* as a full-time assistant professor in the practice of general neurology, and did not aver that she devoted 50 percent or more of her time to any subspecialty. *Maxey*, unpub op at 11, 13.

### 3. *STOKES V SWOFFORD* AND APPLICATION

After the *Perez* and *Maxey* decisions, our Supreme Court decided *Stokes*, which overruled *Woodard* in part. Specifically, our Supreme Court overruled *Woodard* to the extent that it conflated the statutory terms "specialty" and "subspecialty." *Stokes*, 514 Mich at 443-447, 458.

The *Stokes* Court ruled that "[t]he 'matching' required by MCL 600.2169(1)(b) is limited to general board specialties and does not require precise matching of subspecialties." *Stokes*, 514 Mich at 447. The Court agreed with *Woodard*'s definition of "specialty"—that the plaintiff's expert must practice or teach the same particular branch of board-certified medicine that the defendant practices. *Id*. at 444. The Court explained that "the 'matching' requirement under MCL 600.2169 follows the listed general board certifications, which are the baseline 'specialties' recognized by such entities for certification purposes." *Stokes*, 514 Mich at 431.

Applying *Stokes* to the present case, we first consider the doctors' specialties. Dr. Belkin is board-certified in general neurology. Dr. Venkatasubramanian is board-certified in general neurology and two subspecialties: neurocritical care and vascular neurology. Dr. Venkatasubramanian took the same neurology boards as Dr. Belkin, and they both treated patients in the ICU with the same issues, including stroke, myasthenia gravis, seizures, and other neurological disorders.

Here, the one most relevant specialty—the general board certification forming the baseline specialty—was neurology because it is Dr. Belkin's only specialty. Dr. Venkatasubramanian shares that specialty. Although *Stokes* was not yet released when the trial court made its decision, the court correctly decided that Dr. Venkatasubramanian met the criteria of MCL 600.2169(1)(b). To the extent Dr. Venkatasubramanian has additional subspecialties, those are not relevant because both she and Dr. Belkin only share neurology as a specialty. Under *Stokes*, Dr. Venkatasubramanian meets the initial statutory requirement in MCL 600.2169(1). Therefore, we affirm the trial court's order denying the motion to strike.

C.  CAUSATION

The Ascension defendants next contend the trial court erred in denying their motion for summary disposition regarding causation.  We disagree.

As noted above, plaintiff must show, among other factors, proximate causation between the alleged breach and the injury.  *Landin*, 305 Mich App at 533.  Expert testimony is required in medical-malpractice actions to establish causation.  *Dorsey v Surgical Institute of Mich, LLC*, 338 Mich App 199, 231; 979 NW2d 681 (2021).  Proximate cause contains two elements: (1) cause in fact, i.e., "but for" causation, and (2) legal causation.  *Craig v Oakwood Hosp*, 471 Mich 67, 86-87; 684 NW2d 296 (2004), quoting *Skinner*, 445 Mich at 163.

To establish but-for causation, a plaintiff must present substantial evidence from which a jury could conclude that more likely than not, the plaintiff's injuries would not have occurred but for the defendant's conduct.  *Skinner*, 445 Mich at 163.  The plaintiff must set forth specific facts to "support a reasonable inference of a logical sequence of cause and effect."  *Id.* at 174.  A causation theory premised on mere speculation or possibilities is insufficient.  *Id*.  "Proximate cause is a question for the jury to decide unless reasonable minds could not differ regarding the issue."  *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009).

The Ascension defendants argue Dr. Venkatasubramanian's opinion on causation does not support plaintiff's theory that Mr. Khosho's treatment at Ascension led to his death.  They contend that because Dr. Venkatasubramanian did not consider Mr. Khosho's complete medical records, including those from Henry Ford, her opinion that Mr. Khosho's treatment at Ascension made him ventilator-dependent does not reconcile with the facts.  The Ascension defendants accuse Dr. Venkatasubramanian of "cherry picking" medical records, citing 29 Wright & Miller, Federal Practice & Procedure (2017), § 6268 ("If an expert 'cherry picks' favorable data . . . but ignores a significant quantity of other important facts, the trial court would be justified in concluding that the expert's testimony is not based on sufficient facts or data.").  The Ascension defendants have pointed to one fact allegedly ignored by Dr. Venkatasubramanian which breaks the logical chain of events and absolves them of liability—that Mr. Khosho was extubated for over a week and returned to baseline while admitted to Henry Ford.  That fact, they argue, conflicts with Dr. Venkatasubramanian's testimony that Ascension's treatment of Mr. Khosho "basically ensured he would never get off a ventilator."

To support their argument, the Ascension defendants cite *Badalamenti v Beaumont Hosp-Troy*, 237 Mich App 278; 602 NW2d 854 (1999), where the parties disputed whether the plaintiff suffered cardiogenic shock.  Although the plaintiff claimed he had, the defendants instead believed the plaintiff had suffered a rare and severe negative reaction to a drug given to him in the emergency room.  The defendants appealed the jury verdict in favor of the plaintiff and argued the plaintiff's expert's opinion was contrary to the facts.  *Id*. at 281-282.

This Court in *Badalamenti* explained that the opinion of an expert witness should reconcile with the facts:

> [A]n expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts.  This is true where an expert witness'

testimony is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to reconcile his inconsistent testimony other than by disparaging the witness' power of observation. [*Id*. at 286 (citations omitted.]

The plaintiff's expert in *Badalamenti* testified that he had "skepticism" of the echocardiogram and was unwilling to accept the defendant doctor's finding that the plaintiff's heart function was nearly normal. *Id*. at 287. The record reflected no evidence to support the expert's conclusion that the plaintiff's heart was significantly damaged during the relevant time frame, and he merely disparaged the treating physician's findings. *Id*. The expert even agreed that a competent cardiologist could conclude the plaintiff did not suffer cardiogenic shock and agreed that a negative reaction to the drug could not be ruled out. *Id*. On appeal, this Court concluded that the expert's testimony in *Badalamenti* was legally insufficient to support his theory that the plaintiff had been in cardiogenic shock. *Id*. at 289.

This case is distinguishable from *Badalamenti*. Here, Dr. Venkatasubramanian testified that Mr. Khosho developed severe critical myasthenia and was unable to regain sufficient immune function to fight infection and become independent from a ventilator. She opined that, even if the myasthenia was treated, Mr. Khosho was not strong enough to be off the ventilator. She believed that the extremely high dose of steroids given at Ascension over a prolonged period negatively affected Mr. Khosho's recovery, and it was more likely than not he would have survived had he received proper care.

While the Ascension defendants argue Mr. Khosho returned to baseline at Henry Ford and that this breaks the chain of causation, they do not acknowledge that Mr. Khosho was unable to *sustain* extubation at Henry Ford—a fact that supports Dr. Venkatasubramanian's theory that Mr. Khosho had become ventilator-dependent because of the treatment at Ascension. Dr. Venkatasubramanian's testimony left room for this outcome, albeit not much, when she said Khosho would "basically" never get off a ventilator. In this way, Dr. Venkatasubramanian's opinion is not inconsistent with the evidence. The high doses of steroids Mr. Khosho received at Ascension made his muscles—including his diaphragm—extraordinarily weak. Further, Dr. Venkatasubramanian's deposition testimony reflects she was aware of the treatment Mr. Khosho received at Henry Ford, and she opined that doctors at Henry Ford treated Mr. Khosho properly by giving him the appropriate steroid in the proper doses after the Ascension defendants failed to do so, and stated that the damage had already been done while Mr. Khosho was at Ascension. Dr. Venkatasubramanian's opinion is not completely unsupported and is not, as defendants argue, inconsistent with the established facts.

Therefore, this case is distinguishable from *Badalamenti* and the other two cases cited by defendants regarding this issue in that it is not based on assumptions that cannot be reconciled with the facts in the record.[6] We conclude the trial court properly decided that a genuine issue of

---

[6] In *Thornhill v Detroit*, 142 Mich App 656; 369 NW2d 871 (1985), the expert's theory relied on an assumption that other witnesses proved was unsupported. *Id*. at 661. *Thornhill* would be helpful here only if Dr. Venkatasubramanian's opinions were proven unsupported; defendants,

-10-

material fact exists as to causation and correctly denied summary disposition to the Ascension defendants.

## D. DIRECT LIABILITY

Defendants next contend Ascension and MIND are entitled to summary disposition on plaintiff's claims regarding negligent hiring, supervision, policies, and procedures because plaintiff has not supported those claims with expert testimony critical of Ascension and MIND. We disagree.

Claims regarding a medical facility's inadequate training or staffing sound in medical malpractice because, during a hospital's relationship with a patient, the provision of medical care and treatment includes supervision, training, and retention of physicians and medical staff. See *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 426-427; 684 NW2d 864 (2004). Consequently, expert testimony on this subject is necessary, because "[t]he ordinary layman does not know the type of supervision or monitoring that is required for []patients in a[n acute care] ward." *Id*. at 426 (citation omitted); see also *Dorsey*, 338 Mich App at 231.

This is not an instance where an expert testified contrary to the expert's affidavit of merit, as in *Dykes v William Beaumont Hosp*, 246 Mich App 471, 481; 633 NW2d 440 (2001), cited by the Ascension defendants. In *Dykes*, the plaintiff's expert witness, Dr. Trigg, stated in the affidavit of merit that "had the standard of care been followed, [the decedent] would [have] had a greater [than] 50% chance of surviving the infectious process from which he suffered . . . ." *Id*. at 475. However, in Dr. Trigg's deposition, he contradicted his affidavit of merit, stating there was no way of knowing whether, "if [the decedent] had received anti-pseudomonas medication during the February 12 hospitalization, [] he would have lived longer than April 2, 1992." *Id*. at 479. When Dr. Trigg moved for summary disposition as to causation, the plaintiff maintained the conflicting testimony in Dr. Trigg's affidavit and deposition testimony presented a question of fact for the jury. *Id*. at 480. The trial court and this Court disagreed, holding parties may not "contrive factual issues" by asserting deposition testimony contrary to an affidavit, or vice versa. *Id*. (citation omitted). This Court stated that where an affidavit of merit merely restates the pleadings, but an expert makes conflicting statements in a deposition in a "clear, intelligent, unequivocal" manner, the contradictory affidavit should be disregarded. *Id*. at 480-481 (citation omitted). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of

---

while challenging those opinions, have not shown they are unsupported. Further, this Court is not required to follow a case decided before November 1, 1990, MCR 7.215(J)(1), although a published case decided by this Court "has precedential effect under the rule of stare decisis," MCR 7.215(C)(2). Likewise, *Green v Jerome-Duncan Ford, Inc*, 195 Mich App 493; 491 NW2d 243 (1992), is not dispositive here. In *Green*, the expert's testimony conflicted with the plaintiff's testimony, testimony of the eyewitnesses, and record facts. *Id*. at 499-500. Dr. Venkatasubramanian's testimony does not conflict with the Henry Ford records when she said Mr. Khosho was ventilator-dependent because he ultimately required intubation at Henry Ford after a period of time off the ventilator.

-11-

summary judgment as a procedure for screening out sham issues of fact." *Id*. (citation omitted). The trial court granted, and this Court affirmed, summary disposition to Dr. Trigg as to causation. *Id*. at 482.

By contrast, Dr. Venkatasubramanian's deposition testimony does not conflict with her affidavit of merit. The Ascension and MIND defendants argue she has no basis to criticize their policies and procedures because she admitted in her deposition that she did not review them. But as plaintiff points out, there is no testimony from Dr. Venkatasubramanian that she recanted any key allegation of her affidavit of merit, even if she admitted she did not review policies and procedures. In support of the claim for direct liability of the Ascension and MIND defendants, plaintiff cites Dr. Venkatasubramanian's affidavit of merit submitted with the complaint, averring that Ascension and MIND owed a duty, and failed in that duty, to:

> a. Select, employ, train and monitor its agents, actual and/or ostensible, servants, employees and/or its staff of physicians, nurses and residents, to ensure they were competent to perform adequate medical care for a patient;
>
> b. Ensure that appropriate policies and procedures are adopted and followed;
>
> c. Any additional acts of negligence identified through the discovery process.

In her deposition, Dr. Venkatasubramanian testified that she reviewed all 2,906 pages of Mr. Khosho's medical records from Ascension which were submitted to her by plaintiff's counsel. She observed from the records that Dr. Belkin was the neurologist who prescribed Mr. Khosho's treatment for myasthenia gravis while Mr. Khosho was in the ICU at Ascension, and Dr. Belkin saw him four times before he was transferred to Henry Ford. Dr. Venkatasubramanian opined that at each one of those four visits, "there were opportunities to make sure that Mr. Khosho was on the right dose and the right duration of immunosuppressive therapy," and that the steroid dosage was inappropriately high. She testified there were no infectious disease doctors caring for Mr. Khosho regarding his steroid dose despite the handwritten notes in the medical records repeatedly reflecting that Mr. Khosho was on high-dose steroids that needed to be tapered down.

Ascension and MIND's counsel then asked the following questions on cross-examination:

> *Q*. Did you note in the chart that any other physician told Dr. Belkin they thought the dosage of steroids was inappropriate?
>
> *A*. I don't think those things are usually noted in a chart in any hospital. But the dosage of steroids that Mr. Khosho was on was extraordinarily high.
>
> *Q*. Okay. Back to my question. I'm asking a very specific thing. Just respect the process. In the chart, is there any communication from a physician to Dr. Belkin that they were concerned that the dosage of steroids was too high, or inappropriately high, as you've said?
>
> *A*. There is discussion that the dosage of steroids is high and it needs to be tapered down.

*Q*. Okay. But you used the term "inappropriately high." Did anybody— What I'm asking you, does any physician in the chart communicate with Dr. Belkin the same concern that you had, that the dosage of steroids was inappropriately high?

*A*. I do not see the word "inappropriate." What I'm saying is the dosage of steroids that Mr. Khosho was on was inappropriately high.

\* \* \*

*Q*. All right. And you saw the depositions of some of the treating physicians. In the deposition testimony, outside of the [medical] records, do any of those physicians express a concern that the treatment with immunosuppressive medications, steroids, IVIG, or plasmapheresis was inappropriate, as you've indicated.

*A*. Number one, I don't believe any of them were asked that question. And number two, from the depositions, they all deferred to Dr. Belkin, who was managing the neurological aspect of myasthenia gravis.

Dr. Venkatasubramanian admitted on cross-examination that an infectious disease specialist was involved in Mr. Khosho's care at Ascension every day that he was admitted.

The cross-examination went on:

*Q*. And it is appropriate for a neurologist to rely on their colleagues and other specialties. Be it infectious disease or cardiologist or nephrology, whatever it may be, that's appropriate to rely on the expertise of colleagues in other specialties of medicine, correct?

*A*. Well, my response to that would be yes, it is okay for them to rely on the expertise of the infectious disease [doctor] as to the choice of antibiotics. But when you are treating a patient with an inappropriate dose of immunosuppressants and an inappropriate duration of immunosuppressants that is making them susceptible and vulnerable to infections, then it is the neurologist's duty to communicate with the infectious disease doctors about that. But is it okay for them to rely on the [infectious disease] doctors for the type of antibiotics to be chosen? Sure.

*Q*: And do you believe that Dr. Belkin was not in communication with the infectious disease physicians regarding this patient?

*A*: Well, I don't see any documentation in Dr. Belkin's notes about the concern for the heavy immunosuppression and immunomodulation therapy that Mr. Khosho was on, and how it was impacting susceptibility to severe infections.

*Q*: And do you hold the opinion that the infectious disease specialists during this hospitalization were unaware of the dosage or the duration of [the treatment Dr. Belkin prescribed]?

-13-

*A.* Well, I'm not saying they were unaware. What I'm saying is I see in the infectious disease notes, and also other—I guess it's critical care notes, about asking to taper down the high-dose steroids on multiple occasions. It wasn't that they were unaware of it. They were aware that he was on extremely high doses, and a prolonged period of high doses of immunosuppression, that they were asking to taper it down.

\* \* \*

*Q.* All right. Do you understand that the infectious disease specialist could have stopped any of those medications or any of those therapies at any time if they so [choose]?

\* \* \*

*A.* That is not the way it works in the hospital, where you stop the therapies that are being ordered by another consultant or another physician. You discuss with them and you request them to decrease the dose of the therapies that they are on. And I see discussions [and] documentation in the chart about that.

This exchange shows Dr. Venkatasubramanian's deposition transcript does not conflict with, but rather expands on the allegations in her affidavit of merit that the Ascension defendants lacked proper procedures for treatment of myasthenia gravis with high doses of immunosuppressants. Although she does not so explicitly testify, her testimony suggests Ascension and MIND failed to train their specialists to communicate with each other to adequately address concerns with patients' treatment. Taken together, Dr. Venkatasubramanian's deposition testimony, in conjunction with the affidavit of merit, support direct liability for an institutional failure in Ascension and MIND's training and "monitor[ing] their agents" . . . "to ensure they were competent to perform adequate medical care for a patient." Viewing the evidence in the light most favorable to plaintiff, as we must, this testimony does not foreclose on the issue of direct liability, and a genuine issue of material fact remains regarding direct liability of the Ascension and MIND defendants. Unlike Dr. Trigg's testimony in *Dykes*, the testimony here does not strike us as the deponent testifying in conflict with their affidavit in a "clear, intelligent, unequivocal" manner. *Dykes*, 246 Mich App at 480-481. Plaintiff has offered evidence sufficient to show a genuine issue of material fact exists on this point. We affirm the denial of summary disposition to the institutional defendants regarding plaintiff's claims of direct liability.

## E. CROSS-APPEAL[7]

Nor did the trial court err when it denied Dr. Smith's motion for summary disposition. The trial court properly determined that, when the evidence is viewed in the light most favorable to the plaintiff, there are genuine issues of material fact to be resolved by a fact-finder. *Patel*, 344 Mich App at 271.

Dr. Smith argues that the trial court erred because Dr. Irwin testified that the antibiotics prescribed to Mr. Khosho were appropriate as of September 20, 2015, and Dr. Venkatasubramanian testified that Mr. Khosho's condition was at the "point of no return" on September 18 or 19, 2015. As discussed, a plaintiff in a medical malpractice case must show, among other factors, a breach of the standard of care by the defendant, *Landin*, 305 Mich App at 533, and to do so, expert testimony generally is required, *Danhoff*, 513 Mich at 432.

Dr. Smith contends that Dr. Irwin admitted the prescribed antibiotics were appropriate during the time frame Dr. Venkatasubramanian identified as being before the point of no return. Dr. Smith, however, has failed to consider the whole of the experts' testimony in a light most favorable to plaintiff, as mandated when moving for summary disposition. *Patel*, 344 Mich App at 271.

Dr. Venkatasubramanian testified that, because Mr. Khosho was not appropriately treated with the correct antibiotics and was given excessive immunosuppression from the steroids, he was

---

[7] The parties do not challenge this Court's jurisdiction over Dr. Smith's cross-appeal, and we find no ground to limit our consideration of Dr. Smith's cross-appeal. MCR 7.207(A)(2) provides:

> If there is more than one party plaintiff or defendant in a civil action and one party appeals, any other party, whether on the same or opposite side as the party first appealing, may file a cross-appeal against all or any of the other parties to the case as well as against the party who first appealed. If the cross-appeal operates against a party not affected by the first appeal or in a manner different from the first appeal, that party may file a further cross-appeal as if the cross-appeal affecting that party had been the first appeal.

The present case is a civil action where there is more than one defendant. And although Dr. Smith is on the same side as Ascension (more or less), this court rule still permits a cross-appeal from a defendant so situated. We note that this appeal arises from the granting of an application filed by the Ascension defendants, not Dr. Smith; Dr. Smith's request for leave to appeal was denied. But that leave denial was for "for failure to persuade the Court of the need for immediate appellate review," and not substantive in nature. *Rott v Rott*, 508 Mich 274, 286; 972 NW2d 789 (2021). We thus decline to limit Dr. Smith's cross-appeal and instead consider it on the merits. See *Bancorp Group, Inc v Meister*, 459 Mich 944; 590 NW2d 65 (1990).

on a course of no return by September 18 or 19, 2015. More likely than not, had he been properly treated, he would still be alive today.

Dr. Irwin's testimony, if considered,[8] suggests that Mr. Khosho was not beyond the point of no return on September 18 or 19, 2015. Dr. Irwin agreed Meropenem was appropriate, but stated that Dr. Smith failed to give it soon enough. If Mr. Khosho had received Meropenem 48 hours earlier, Dr. Irwin opined that his pneumonia would not have been so bad. He also opined that Meropenem could have been given on September 20, 2015, because Mr. Khosho had sufficient criteria to warrant the change.[9] However, Dr. Irwin agreed with Dr. Venkatasubramanian and Dr. Ross that the two antibiotics Dr. Smith first prescribed put Mr. Khosho at greater risk, and doctors should have given him antibiotics to treat multidrug-resistant bacteria sooner.

On appeal, Dr. Smith focuses on Dr. Irwin's testimony, but Dr. Ross also testified that Dr. Smith should not have delayed the antibiotics necessary to treat community-acquired pneumonia. Dr. Ross opined that Dr. Smith should have ordered targeted tests and obtained appropriate specimens from the respiratory tract to allow those antibiotics to be given sooner. The antibiotics first prescribed were contraindicated for patients with myasthenia gravis. Dr. Smith also failed to fully account for Mr. Khosho's immune-suppressed state. Further, Dr. Smith should have switched antibiotics given Mr. Khosho's increasing white blood cell count and his chest x-ray. Dr. Ross also believed Dr. Smith should have started Mr. Khosho on the proper antibiotics immediately. In short, Dr. Smith should have recognized that something other than myasthenia gravis was causing the problem where Mr. Khosho had the classic presentation of community-acquired pneumonia.

Further, Dr. Ross did not agree with Dr. Irwin that Mr. Khosho received appropriate antibiotics before September 20, 2015. Mr. Khosho's medical chart did not identify the bacteria involved and, because only one culture was done, there was no way of knowing for sure the bacteria he was fighting. Dr. Ross opined it was more likely than not that Mr. Khosho would not have died had he been treated appropriately at Ascension for community-acquired pneumonia. He stated it was not just a question of the wrong antibiotics being administered; other factors were at issue. Dr. Ross could not say exactly what antibiotics should have been given earlier at Ascension because the proper tests were not ordered.

Even accepting Dr. Irwin's testimony that Mr. Khosho was given appropriate antibiotics, Dr. Smith has not accounted for testimony from Drs. Venkatasubramanian and Ross that he did not receive the proper antibiotics. The testimony from plaintiff's experts includes specific facts that could support a reasonable inference that Dr. Smith's failure to prescribe the correct antibiotics

---

[8] Some question exists regarding whether Dr. Irwin will be called by either party as a witness. Plaintiff's counsel stated at the hearing that he would not be using Dr. Irwin as an expert witness. Because Dr. Smith relies on Dr. Irwin's testimony, however, we consider it.

[9] Dr. Irwin mistakenly believed the Meropenem was not given until September 23, 2015, when, in actuality, it was given on September 21, 2015. Where he stated that the antibiotic could have been given on September 20, 2015, it arguably was given at least 24 hours too late.

sooner resulted in the pneumonia that caused Mr. Khosho's death. Given these divergent opinions, a genuine issue of material fact precludes summary disposition.

Alternatively, Dr. Smith argues that a *Daubert* hearing is needed. Before testimony from a plaintiff's expert may be admitted at trial, the plaintiff must prove that the testimony is relevant to the case at bar and reliable, i.e., that the scientific community generally accepts it. *Danhoff*, 513 Mich at 444. The trial court serves as a "gatekeeper" in determining the admissibility of expert evidence. *Mueller v Brannigan Bros Restaurants & Taverns LLC*, 323 Mich App 566, 586; 918 NW2d 545 (2018). See also MRE 702.[10] Further, MCL 600.2955(1) sets forth factors for a trial court to consider in deciding whether an expert's opinion is reliable. Those factors include:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

---

[10] That rule of evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

In support, Dr. Smith merely argues that the opinions provided by plaintiff's experts are inconsistent and contradictory. But Dr. Smith provides no medical literature to challenge the opinions of plaintiff's experts.[11] Nor does he present defense expert testimony on this issue. He also does not argue that the challenged expert testimony would be substantially inadmissible or suggest that their opinions were not rationally derived or were not grounded in a recognized form of scientific knowledge. In short, Dr. Smith does not offer evidence to shake the foundation of the expert testimony; he merely points to internal inconsistencies. Those inconsistencies can be addressed on cross-examination, not a *Daubert* hearing.

Dr. Smith next argues that plaintiff has not shown causation where plaintiff's experts state that Mr. Khosho did not have pseudomonas pneumonia at Ascension, and, even if he did, the antibiotics he was given treat pseudomonas; further, Mr. Khosho did not die of pseudomonas until 50 days after he was transferred to Henry Ford. Viewing the evidence in the light most favorable to plaintiff, the trial court did not err in denying Dr. Smith's motion for summary disposition on this ground.

As discussed, plaintiff must show proximate causation between the alleged breach by the defendant and the injury. *Landin*, 305 Mich App at 533. Proximate cause contains two elements: (1) cause in fact, i.e., "but for" causation, and (2) legal causation. *Craig*, 471 Mich at 86-87, quoting *Skinner*, 445 Mich at 163. Expert testimony is required. *Dorsey*, 338 Mich App at 231. A plaintiff must present substantial evidence from which a jury could conclude that more likely than not, the injuries would not have occurred but for the defendant's conduct. *Benigni v Alsawah*, 343 Mich App 200, 213-214; 996 NW2d 821 (2022).

---

[11] Plaintiff's experts did not cite specific medical literature regarding myasthenic crises. When asked if she had medical literature in support of her expert opinion, Dr. Venkatasubramanian answered:

> I haven't gone out looking for any literature. This is a very common condition that I treat as a neurologist. Myasthenic crisis has been known for I don't know—decades now, and the treatment is pretty well laid out, you know. And I've been practicing this for over two decades. So I wouldn't say there's anything particular that I went out looking for.

She then explained she relied on the body of literature addressing myasthenic crises, adding that many articles had been published on the topic. Dr. Ross testified that he relied on his experience for his opinion, but he could provide literature about the effects of prolonged intubation and hospitalization on survival, although he did not have specific references at his deposition.

Dr. Smith contends plaintiff's experts admitted that Mr. Khosho did not have pseudomonas pneumonia at Ascension. Dr. Smith, however, ignores or mischaracterizes portions of the testimony from plaintiff's experts.

Dr. Irwin testified that Mr. Khosho had ventilator-assisted pseudomonas pneumonia at Ascension, whether the hospital said so or not. He explained that Ascension doctors should have suspected that it would develop because Mr. Khosho had significant risk factors for developing it—he was on a ventilator, he was on steroids and antibiotics, he had a fever of 106°, his sputum appeared to have high white blood cells, which had been increasing, and his chest x-ray had worsened. Mr. Khosho had "late" ventilator-associated pneumonia because it occurred after he had been on a ventilator for more than four days. Dr. Irwin stated that the Ascension doctors did not need to specifically diagnose ventilator-associated pneumonia to have changed antibiotics. He believed the pseudomonas grew at Ascension. Despite Dr. Smith's contention that Dr. Irwin testified pseudomonas was not present, Dr. Irwin's testimony reflects his belief that pseudomonas grew at Ascension.

Dr. Ross also testified that the Ascension defendants failed to properly test for pseudomonas because the test was taken just three days after Mr. Khosho was intubated. Also, Ascension did not test again, they took only one set of cultures. He believed there was no way of knowing whether Mr. Khosho had pseudomonas while at Ascension, but pseudomonas was a concern given the length of time he was intubated. Dr. Ross essentially declined to take a position regarding pseudomonas because defendants did not conduct a timely test; that does not mean he agreed Mr. Khosho did not have pseudomonas at Ascension.

We are obliged to consider the facts in a light most favorable to plaintiff, the nonmoving party. *Patel*, 344 Mich App at 271. Given that, we agree with the trial court that a genuine issue of material fact exists whether Mr. Khosho had pseudomonas at Ascension.

Dr. Smith then contends that even if Mr. Khosho had pseudomonas at Ascension, the antibiotics he was given cover pseudomonas. But, again, Dr. Smith ignores Dr. Ross's expert opinion that Dr. Smith delayed antibiotics to treat community-acquired pneumonia. Dr. Ross opined the antibiotics first prescribed were contraindicated for patients with myasthenia gravis, that Dr. Smith failed to fully account for Mr. Khosho's immune-suppressed state, and Dr. Smith should have switched antibiotics given his increasing white blood cell count and the chest x-ray. In other words, Dr. Smith should have recognized that something other than myasthenia gravis was causing the problem because Mr. Khosho had the classic presentation of community-acquired pneumonia.

Moreover, Dr. Irwin testified Meropenem was appropriate, but stated that it was not given soon enough. If Mr. Khosho had been given that antibiotic 48 hours earlier, in his opinion, the pneumonia would not have been so bad. The two antibiotics prescribed first put Mr. Khosho at greater risk and the treating doctors should have given him antibiotics sooner to treat multidrug-resistant bacteria.

Dr. Ross did not agree with Dr. Irwin that Mr. Khosho received appropriate antibiotics before September 20, 2015. The chart did not identify the bacteria involved, so there was no way of knowing for sure. He opined it was more likely than not that Mr. Khosho would not have died

had he been treated appropriately at Ascension for community-acquired pneumonia.  He stated it was not just a question of the wrong antibiotics being administered; other factors were at issue. Dr. Ross could not say exactly what antibiotics should have been given earlier at Ascension because the proper tests were not ordered.

In our review of the record, plaintiff's experts have testified about specific facts, which could support a reasonable inference that Dr. Smith's failure to prescribe the correct antibiotics sooner resulted in the pneumonia that caused Mr. Khosho's death.  This is not an instance where reasonable minds could not differ.  Rather, proximate cause generally is a question for the fact-finder to decide under that circumstance.  *Dawe v Bar-Levav & Assoc (On Remand)*, 289 Mich App 380, 393; 808 NW2d 240 (2010).  In light of the expert testimony, Dr. Smith has not shown that he was entitled to summary disposition.

Finally, Dr. Smith again contends that a *Daubert* hearing is necessary.  For the reasons discussed above, the trial court did not err by declining to hold a *Daubert* hearing.

Affirmed.

/s/ Adrienne N. Young
/s/ Anica Letica
/s/ Daniel S. Korobkin